# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

David M. Pascoe, Solicitor of the First Judicial Circuit, Petitioner,

v.

Alan M. Wilson, South Carolina Attorney General, Respondent.

Appellate Case No. 2016-000671

_____

David M. Pascoe, Solicitor of the First Judicial Circuit, Petitioner,

v.

James R. Parks, Clerk of Court for the State Grand Jury, Respondent.

Appellate Case No. 2016-000630

————

# IN THE ORIGINAL JURISDICTION

————

Opinion No. 27646
Heard June 16, 2016 – Filed July 13, 2016

————

# DECLARATORY JUDGMENT ISSUED

————

David M. Pascoe, Jr., of Orangeburg, pro se Petitioner.

C. Mitchell Brown, of Nelson Mullins Riley &
Scarborough, LLP, Attorney General Alan McCrory
Wilson, Chief Deputy Attorney General John W.
McIntosh, Solicitor General Robert D. Cook, Assistant
Deputy Attorney General  Samuel Creighton Waters, all
of Columbia, for Respondents.

---

**CHIEF JUSTICE PLEICONES:**  We agreed to hear these cases in the Court's original jurisdiction.  The cases arise out of an on-going South Carolina Law Enforcement Division ("SLED") investigation into the past conduct of certain members of the General Assembly (the "redacted legislators").  Petitioner David Pascoe ("Pascoe") asks this Court declare "the Attorney General" recused himself and his Office from the redacted legislators matter, and vested Pascoe with the legal authority to act autonomously as the designee of the Attorney General with the powers of that Office.  Pascoe further asks this Court command respondent James R. Parks ("Parks"), clerk of the state grand jury, to cooperate with Pascoe's initiation of the state grand jury investigation.  We grant the petition for declaratory relief and declare that respondent Attorney General Wilson ("Wilson") and the Attorney General's Office were recused from the redacted legislators investigation; Pascoe lawfully sought to initiate a state grand jury investigation; and the Attorney General's Office's purported termination of Pascoe's designation was not valid.  Recognizing the integrity of the parties involved, we decline to formally issue relief in the mandamus action, confident that our resolution of the declaratory judgment action makes clear the responsibilities and roles of the parties.

## FACTS

As these cases are being heard in the Court's original jurisdiction, we sit as the fact-finders.[1]  The burden of proof as to all issues rests with Pascoe.[2]

---

[1] *See* S.C. Code Ann. § 14-3-340 (1977) ("Whenever in the course of any action or proceeding in the Supreme Court arising in the exercise of the original jurisdiction

On July 24, 2014, Wilson appointed Pascoe to serve as the "designated prosecutor" in the investigation and prosecution of Robert Harrell ("Harrell").[3]  At the time of Pascoe's appointment, Harrell was being investigated for alleged crimes committed in his capacity as a legislator.  A SLED report generated during the Harrell investigation contained the redacted names of certain legislators (the "redacted legislators"), who were allegedly implicated in unethical and illegal conduct.[4]

On October 1, 2014, Pascoe sent Wilson an email referencing a discussion they had the night before, and stating he believed the redacted legislators should be investigated as part of "any corruption probe on the legislature."

On October 2, 2014, Wilson emailed Chief Deputy Attorney General John McIntosh ("McIntosh") with Pascoe's email attached.[5]  In his email to McIntosh, Wilson stated, "As this office moves forward with this investigation there might be inherent conflicts between myself and members of the house . . . .  Because certain conflicts might exist I want you to take over as supervising prosecutor. . . .  Please ensure that I am firewalled from any involvement in that specific instance. . . ."  By

---

. . . an issue of fact shall arise . . . , or whenever the determination of any question of fact shall be necessary to the exercise of the jurisdiction conferred upon the Supreme Court, the court may frame an issue therein and certify the same to the circuit court . . . ."); *Sanford v. S.C. State Ethics Comm'n*, 385 S.C. 483, 497, 685 S.E.2d 600, 607, *opinion clarified*, 386 S.C. 274, 688 S.E.2d 120 (2009).

[2] *See Vermont Mut. Ins. Co. v. Singleton By & Through Singleton*, 316 S.C. 5, 10, 446 S.E.2d 417, 421 (1994) (citing *Martin v. Cantrell*, 225 S.C. 140, 81 S.E.2d 37 (1954) (declaratory judgment)); 55 C.J.S. *Mandamus* § 405 (2016) (mandamus).

[3] Harrell is the former Speaker of the South Carolina House of Representatives. On October 23, 2014, Harrell pled guilty and resigned from office.

[4] At the time Pascoe was designated the prosecutor in the Harrell matter, a state grand jury had already been impaneled.  No issue concerning the validity of Pascoe's authority in that matter is before the Court.

[5] The email CC'd Solicitor General Bob Cook ("Cook").

email the same day, McIntosh accepted the designation as supervising prosecutor. McIntosh further assured Wilson that per his wishes, Wilson would be firewalled from any involvement in the matter.

It is unclear from the evidence before this Court whether the initial Harrell investigation led to further investigations beyond that of the redacted legislators. The exhibits before this Court further do not contain any indication the Attorney General's Office itself investigated or pursued the redacted legislators matter after October 2, 2014, although later correspondence discussed *infra* indicate SLED was conducting an ongoing investigation after that date into these individuals. The correspondence between Wilson and McIntosh appear to be internal, and there is no evidence the content of the emails was made available to Pascoe or anyone outside the Attorney General's Office. The exhibits reflect the next communication regarding the redacted legislators matter was in July 2015.

On July 17, 2015, McIntosh wrote a letter to the Chief of the South Carolina Law Enforcement Division, Mark Keel ("Chief Keel"), asking he forward the SLED report resulting from the investigation into the redacted legislators to Pascoe "for a prosecutive decision." The letter further stated, "As you are aware, the Attorney General *recused this office* from the legislative members in the redacted portions of the SLED report but has not recused *this office* from any other matters" (emphasis supplied). From this language, we conclude that SLED may have been investigating matters related to the Harrell probe aside from those involving the redacted legislators.

Chief Keel has provided an affidavit to this Court to the effect that his understanding of the July 17, 2015, letter was that the Attorney General's Office had thereafter recused itself from any involvement in the redacted legislators matter, and that SLED was to deal exclusively with Pascoe. Chief Keel further states that in accord with his understanding, after the July 17, 2015, letter, he and SLED in fact dealt exclusively with Pascoe in the matter, and at no point was any information or evidence concerning the redacted legislators investigation shared with the Attorney General's Office.

On July 24, 2015, McIntosh's July 17, 2015, letter was forwarded to Pascoe by Assistant Deputy Attorney General S. Creighton Waters ("Waters") as a scanned attachment to an email. Also attached to the Waters email was a scanned letter from Waters to Pascoe, stating:

> As you are aware, several months ago the Attorney
> General firewalled himself from any involvement into the
> investigation of certain individuals covered in the still-
> redacted portion of the SLED report. . . .  That portion of
> the investigation still remains open. . . .  I am writing to
> let you know that out of an abundance of caution,
> [McIntosh] sent [Keel] a letter . . . asking that agency
> forward to you the results of any further investigation. . .
> .

The body of the email further stated Pascoe and SLED were to make the decision regarding whether redacted portions of the SLED report should be released to the media.  This July 2015, correspondence notifying Pascoe he had been granted authority over the redacted legislators matter also informs Pascoe that the Attorney General's *Office* was recused.

On July 27, 2015, Pascoe responded to Waters' email, stating:

> I will probably give you a call later today or in the
> morning for some clarification, but my understanding
> from the two letters you sent me[6] is that the Attorney
> General is asking that I make a prosecutorial decision on
> the redacted matters of the SLED report. . . .  I assume
> further investigation was conducted on the redacted
> matters that I am not privy to as of yet.  I may also need
> to conduct further investigations into those matters.

Given the status of the individuals who were the subject of this investigation, and the fact that it arose out of the state grand jury investigation of then Speaker Harrell, it may be inferred that further investigation into the redacted legislators matter at some juncture might warrant the impaneling of a state grand jury.

We have no evidence of communication between Pascoe and anyone at the Attorney General's Office from July 2015 to September 2015.  However, by mid-September 2015, the exhibits reflect disharmony between Pascoe and individuals

---

[6] Presumably, Pascoe is referring to the July 17, 2015, letter from McIntosh to Chief Keel, and the July 24, 2015, letter from Waters to Pascoe, both of which were attached to the email sent by Waters on July 24, 2015.

in the Attorney General's Office, apparently precipitated by media leaks regarding the redacted legislators investigation, and the fact that Solicitor General Cook had been in contact with an attorney representing one of the redacted legislators.

On September 17, 2015, McIntosh sent Pascoe a letter noting the Attorney General's Office had possessed the SLED report containing the redacted legislators' names for two years—indicating the report was generated during the Harrell investigation—and that no portion thereof was leaked until after Pascoe was asked to make a "prosecutorial decision." The letter then states, "[D]uring the past ten months, there has been considerable discussion back and forth between this office and law enforcement, in which additional questions have been raised. The length of the inquiry has thus necessarily been prolonged by these additional questions." The letter concludes with a reminder that the public must have confidence in the integrity of the criminal process, and that the public should have full disclosure of all redacted information in the SLED report at the earliest appropriate time.

A number of questions are raised by McIntosh's September 17, 2015, letter. Principally, the nature of the Attorney General's Office's ten month "inquiry" is unclear, though exhibits indicate the Attorney General's Office may have been conducting a separate investigation related to information contained in the Harrell SLED report, but unrelated to the redacted legislators matter.

On September 25, 2015, Pascoe responded by letter to McIntosh, writing:

> I ask that your office not interfere in this investigation any further unless I ask for your assistance. . . . [I]t is my understanding from my discussions with SLED that your office conducted no further investigation into the matters after my October 1, 2014 email. . . . *The Attorney General's Office* has a very clear conflict of interest in this matter. If the public is to have confidence in the integrity of the criminal process in this case, *it is imperative that the Attorney General's Office recuse itself.* . . . [Y]our letter does nothing but heighten my concern that the *Attorney General's Office continues to work behind the scenes in an investigation for which you claim a conflict of interest* (emphasis supplied).

On September 27, 2015, Cook emailed Pascoe. In that email, Cook stated he was "stunned" at the contents of Pascoe's September 25, 2015, letter to McIntosh. Cook then stated:

> [W]e all understood perfectly well that *the Office had no role* in the *[redacted name]* matter. [McIntosh] and I had discussed sending it to you since you were already involved in Harrell. Our concern was the integrity of the process, *(so why would we interfere in that decision afterwards?)* The [Attorney General], as Chief Prosecutor, always retains authority *over the integrity* of a criminal investigation even in a matter in which he is not involved (emphasis supplied).

Cook concluded, "I don't know how I or we were interfering with *your investigation or decision* . . . . I am offended that you think I would interfere in *your case*" (emphasis supplied).

From this exchange, it appears the common understanding was that Pascoe had full control of the redacted legislators matter to the exclusion of the Attorney General's Office. Cook's email suggests the Attorney General's Office's sole concern was the "integrity" of the investigation—ensuring no one involved was leaking information to the media. Protecting "the integrity of the process" appears to be Cook's justification for communicating with the attorney representing one of the redacted legislators.

On September 30, 2015, McIntosh wrote Pascoe a letter stating there was no basis for suggesting the Attorney General's Office was "interfering with *[Pascoe's] investigation*" (emphasis supplied), and further asserting:

> I also take exception to your statement that *the Attorney General's Office* has a very clear conflict of interest in this matter. I am unaware of any conflict which I have, but out of an abundance of caution, the specific portions of the SLED report regarding the interview with [redacted name] *were referred to you for handling as you deem appropriate*. I also take exception to your statement that the Attorney General's Office continues to work behind the scenes in an investigation which you

> claim a conflict of interest. I can assure you that this
> office is not doing any such thing. . . . (emphasis
> supplied).

This exhibit represents the first instance anyone in the Attorney General's Office "take[s] exception" to the unequivocal representations made in the July 2015, correspondence that the Attorney General's Office was recused due to a conflict of interest. While the September 30, 2015, letter denies the assertion that the Attorney General's Office has a "very clear" conflict of interest, McIntosh seems to base this on his personal lack of an actual conflict. Further, the letter does not state that the Attorney General's Office is not recused. Moreover, the letter goes on to state the entire case had been assigned to Pascoe for "handling as [he] deem[ed] appropriate."

By October 21, 2015, the tension appears to have dissipated as evidenced by an email from Pascoe to Cook. In the email, Pascoe referenced a meeting he had that day with McIntosh and Cook, and stated, "I am very grateful that you recommended we sit down and discuss our issues. As it turns out, we have no 'issues' and we are on the same page. . . . " Nothing in the email or subsequent communications indicate what was discussed at the meeting, or what the mutual understanding entailed. The email further requested advisory opinions[7] on two issues related to the redacted legislators investigation.[8]

---

[7] *See* Alan Wilson South Carolina Attorney General, http://www.scag.gov/opinions (last visited July 13, 2016) ("By statute, the Governor, members of the General Assembly, other elected government officials, state agencies, or people appointed to serve on boards and commissions are entitled to legal advice from the Attorney General's Office. The Attorney General also issues legal opinions to certain local officials. An Attorney General's opinion is thus a written public document responding to a specific legal question asked by these elected or appointed government officials. All opinions have been reviewed by the Opinions Section and represent the highest standards of research. An Attorney General's opinion attempts to resolve questions of law as the author believes a court would decide the issue. Unlike a court, however, Attorney General opinions cannot decide factual disputes.").

[8] Specifically, the email requested an opinion as to:

On December 11, 2015, Cook emailed Pascoe the Attorney General opinion covering the issues "as thoroughly as possible." There is no indication in the exhibits filed with this Court of any further communication between Pascoe and the Attorney General's Office until March 2016.

In February 2016, having determined in conjunction with Pascoe that a state grand jury investigation into the redacted legislators matter was necessary, Chief Keel sent a SLED agent to the Attorney General's Office to obtain templates for a state grand jury initiation from SLED Lieutenant Pete Logan ("Lt. Logan"), whose office was located within the state grand jury division of the Attorney General's Office. According to an affidavit by Robert E. Bogan ("Bogan")—a former prosecutor at the Attorney General's Office and assistant to Pascoe in the investigation of the redacted legislators matter—Bogan called Lt. Logan on or about February 12, 2016, to "get the format of the state grand jury initiation paperwork." Bogan asserts he did not disclose to Lt. Logan the subject of the investigation, only that he was assisting Pascoe. Bogan claims Lt. Logan assumed which investigation Bogan was referencing, and replied that the Attorney General did not think it was an appropriate state grand jury case. It does not appear from the exhibits that the templates were supplied.

In March 2016, Pascoe and Chief Keel signed the authorization to initiate a state grand jury proceeding.[9] The initiation memorandum stated the Attorney General's Office was recused from making a prosecutive decision, and such authority was conferred upon Pascoe. On March 18, 2016, presiding judge Clifton Newman met with Pascoe and state grand jury clerk Parks. Judge Newman acknowledged his

---

1. Whether it is a violation of South Carolina law for a Member of the General Assembly to use his own campaign funds to pay for campaign services performed by a business in which the Member or a member of the Member's family has an economic interest, and

2. Whether it is a violation for a South Carolina House Majority Leader to cause or influence the House Legislative Caucus to hire and pay a business in which the Majority Leader has an economic interest.

[9] *See* S.C. Code Ann. § 14-7-1630(B) (Supp. 2015).

notification of the state grand jury initiation by signing the memorandum.[10] Parks then administered the oath of secrecy to Pascoe, and agreed to administer the oath to select members of his staff at a later date. Parks also signed subpoenas at Pascoe's request.

On March 22, 2016, McIntosh and Cook met with Chief Keel and expressed concern as to Pascoe's authority to initiate a state grand jury investigation. According to Chief Keel's affidavit, when he asked McIntosh why neither he nor Pascoe were contacted to discuss these concerns when he sent a SLED agent three weeks earlier to obtain the initiation templates, McIntosh responded he "didn't respond to rumors and didn't know why he should call Solicitor Pascoe."

On March 24, 2016, Parks notified Pascoe via email he would not administer the state grand jury secrecy oath to Pascoe's staff, and would no longer issue subpoenas. In his affidavit, Parks explains he originally cooperated with the state grand jury initiation because he was under the impression the proceeding was authorized based on the language of the initiation memorandum, and Judge Newman's acknowledgment.

On March 25, 2016, Pascoe filed a Petition for a Writ of Mandamus in this Court, asking the Court command Parks: (1) issue the oath of secrecy to Pascoe's staff involved in the state grand jury investigation; (2) issue subpoenas as required; and (3) "perform all other necessary and proper duties required by his office." This Court granted Pascoe's petition for original jurisdiction to address the merits of the mandamus action.

On March 28, 2016, McIntosh sent a letter to Pascoe purportedly terminating all authority delegated to Pascoe "on July 17 and July 24, 2015," because of Pascoe's attempt to "unlawfully" initiate a state grand jury investigation. In his letter, McIntosh stated, "[Y]ou were *given full power to prosecute this matter at the local level* if you deemed such action to be appropriate. However, rather than seeking explicit authority for a State Grand Jury investigation, you sought to initiate that investigation surreptitiously with respect to this office" (emphasis supplied).

_____

[10] South Carolina Code Ann. § 14-7-1630(B) (Supp. 2015) states, "the Attorney General may notify in writing to the chief administrative judge for general sessions in the judicial circuit in which he seeks to impanel a state grand jury that a state grand jury investigation is being initiated."

It is not clear what this "local level" language is meant to suggest. However, nothing in the exhibits before this Court suggests that Pascoe's authority in the redacted legislators matter did not include all the power of the Attorney General, including the impaneling of a state grand jury.

On March 29, 2016, by letter, McIntosh purported to "designate" Fifth Circuit Solicitor Dan Johnson to replace Pascoe, assuring, "The Attorney General has authorized me to say that should you need *any investigative tools, including the State Grand Jury*, please let me know and you will be given that authority"[11] (emphasis supplied).

On March 30, 2016, Pascoe filed a Petition for Declaratory Relief with this Court, seeking the Court declare: (1) Attorney General Alan Wilson recused himself and his office from the investigation and prosecution of the redacted legislators matter; (2) the recusal was full, final, and irrevocable "leaving no role for [Wilson] or his Office in the matter"; (3) in so doing, Wilson exercised his statutory authority to vest Pascoe with the legal authority to act as the designee of the Attorney General imbued with the powers of that office; (4) Wilson's attempt to direct Clerk Parks in this matter was an *ultra vires* act; (5) Wilson's attempt to revoke Pascoe's designation in this matter was an *ultra vires* act; (6) Wilson's attempt to designate Fifth Circuit Solicitor Dan Johnson to investigate and prosecute this matter was an *ultra vires* act; and (7) Wilson and his office must cease and desist from any further involvement in this matter and act in strict accordance with the Court's judgment concerning the law of recusal. We granted Pascoe's petition for original jurisdiction to address the merits of the declaratory judgment action.

## LAW/ANALYSIS

As mentioned *supra*, because these cases are being heard in the Court's original jurisdiction, the Court sits as both the finder of fact and finder of law.[12] We further

---

[11] Dan Johnson declined to accept the designation pending the outcome of the current litigation.

[12] *See* § 14-3-340; *Sanford*, 385 S.C. at 497, 685 S.E.2d at 607.

note that in our view, the present dispute reflects the sincere desire of the parties to ensure the redacted legislators investigation is carried out pursuant to the laws of this state.

On the merits, as discussed *infra*, while some evidence weighs against Pascoe's position, we conclude Pascoe has met his burden of proving by a preponderance of the evidence he was vested with the authority to act as the Attorney General in the redacted legislators matter, and that this authority necessarily included the power to initiate a state grand jury investigation. We further conclude McIntosh's attempt to terminate Pascoe was not effective. Given these determinations, we find it unnecessary to issue a writ of mandamus as we expect the parties will act in accordance with this decision.

Pascoe has the burden of proving his cases by a preponderance of the evidence. *See Vermont Mut. Ins. Co.*, 316 S.C. at 10, 446 S.E.2d at 421 (citing *Martin v. Cantrell*, 225 S.C. 140, 81 S.E.2d 37 (1954) (declaratory judgment)); 55 C.J.S. *Mandamus* § 405 (2016) (mandamus). A preponderance of the evidence is evidence which convinces the fact finder as to its truth. *Gorecki v. Gorecki*, 387 S.C. 626, 633, 693 S.E.2d 419, 422 (Ct. App. 2010) (citation omitted).

Both Pascoe and Wilson argue any transfer of authority was governed by S.C. Code Ann. §§ 14-7-1650 *et seq.* (Supps. 2014 & 2015). We disagree, and find the transfers of authority were not governed by the State Grand Jury Act.

Article 15 of Chapter 7 of Title 14 of the South Carolina Code contains the State Grand Jury Act. S.C. Code Ann. § 14-7-1600 (Supps. 2014 & 2015). Regarding the October 2014, Wilson recusal and subsequent transfer of authority to McIntosh, the version of the State Grand Jury Act effective at that time addressed only the Attorney General's "disqualification"[13] *after* the state grand jury initiation process had begun. *See* S.C. Code Ann. § 14-7-1650(C)(2) (Supp. 2014); *see also, e.g., Ex parte Harrell*, 409 S.C. 60, 760 S.E.2d 808 (2014). More to the point, § 14-7-

---

[13] This version of the statute did not contemplate recusal or voluntary/involuntary removal. It only contemplated disqualification "[w]here it is determined that a conflict of interest" exists. *See* § 14-7-1650 (Supp. 2014).

The content of subsection (C)(2) was amended shortly thereafter effective June 3, 2015.

1650(C)(2), stated, "[I]n the case of the Attorney General's disqualification, the matter shall be referred to a solicitor for investigation and prosecution. Any doubt regarding disqualification *shall be resolved by the presiding judge of the state grand jury*" (emphasis supplied). The fact that disqualification disputes were to be resolved by the judge presiding over the state grand jury proceeding further demonstrates the statute only applied to removal of the Attorney General by disqualification *after* the state grand jury initiation process had begun.

The Wilson recusal and transfer of authority to McIntosh occurred outside the context of a state grand jury proceeding, and, therefore, it occurred outside of the State Grand Jury Act.

Likewise, we find the transfer of authority from McIntosh to Pascoe was not governed by the State Grand Jury Act. The applicable version of § 14-7-1650,[14] effective at the time of the July 2015, transfer of authority to Pascoe, only applies to recusal or disqualification post-initiation of the state grand jury investigation. Specifically, §14-7-1650(C), states, in pertinent part:

> When the Attorney General determines that he should recuse himself *from participation in a state grand jury investigation and prosecution*, the Attorney General may either refer the matter to a solicitor for investigation and prosecution, or remove himself entirely from any involvement in the case and designate a prosecutor to assume his functions and duties pursuant to this article. . . . (emphasis supplied).

This statute, like the version effective in October 2014, addresses a circumstance in which there is an ongoing state grand jury proceeding. Accordingly, we hold the October 2, 2014, transfer of authority to McIntosh, and the July 17, and 24, 2015, transfer of authority to Pascoe, are not governed by any provision of the State Grand Jury Act.

---

[14] Effective June 3, 2015. Wilson submits he substantially influenced the statutory changes made to the State Grand Jury Act that became effective June 3, 2015. Among those changes is the recognition of the Attorney General's ability to recuse himself, as well as his ability to delegate his authority in whole or in part. *See* § 14-7-1650(C) (Supp. 2015).

Further, we find the preponderance of the evidence supports two conclusions: that Wilson unequivocally recused himself from any aspect of the redacted legislators investigation and delegated all authority vested in the elected Attorney General to McIntosh in the October 2, 2014, letter asking that McIntosh "take over as supervising prosecutor"; and, subsequently, that McIntosh, acting as the Attorney General, recused himself and the Attorney General's Office from the redacted legislators investigation, and appointed Pascoe to act as the Attorney General vested with the Attorney General's power and authority for the purpose of that investigation in the July 2015, correspondence.[15] *See Gorecki*, 387 S.C. at 633, 693 S.E.2d at 422 (noting a preponderance of the evidence is evidence which convinces the fact finder as to its truth (citation omitted)).

The initial correspondence from the Attorney General's Office to both Pascoe and Chief Keel in July 2015, stated, without reservation, that the Attorney General's *Office* was recused from the redacted legislators investigation, leaving only Pascoe as the state's highest prosecutor in that matter.[16] Indeed, in his March 28, 2016, letter purporting to terminate Pascoe, McIntosh referred to the dates of July 17, and 24, 2015, as the instances when Pascoe was delegated authority in the redacted legislators matter; the correspondence on those dates stated the Attorney General's Office was recused. Second, the exhibits demonstrate that high level officials at the Attorney General's Office repeatedly stated that the matter was solely within Pascoe's authority, referring to the matter as, *inter alia*, "your investigation or decision," "your investigation," and "your case." Third, several communications maintained the Attorney General's Office was "out of it," and vehemently denied the Attorney General's Office at any point interfered with the redacted legislators investigation. Fourth, Cook's emails suggest the *only* authority remaining with the Attorney General's Offices was ensuring the "integrity" of the investigation, i.e., ensuring no one involved was leaking confidential information to the media. And

---

[15] Thus, Pascoe was acting as the Attorney General for the purpose of the redacted legislators matter fully vested with the authority of South Carolina Constitution Article V, § 24, and, therefore, is not in violation of S.C. Code Ann. § 1-7-380 (2005).

[16] We acknowledge that McIntosh's affidavit submits his July 17, 2015, letter was "in-artfully" drafted. Nonetheless, we find the words of that letter unequivocally conveyed to Pascoe the authority to act as the Attorney General in the redacted legislators matter.

fifth, no correspondence indicated the Attorney General's Office retained any control over the redacted legislators investigation, or that Pascoe was acting at the Office's direction. Specifically, there is no evidence McIntosh, Cook, or Waters requested an update or information as to the progress or contents of the investigation. To the contrary, McIntosh repeatedly reassured the investigation was exclusively under Pascoe's control, and that the Attorney General's Office had not and would not interfere.[17]

We further find of critical importance the fact that Chief Keel, a neutral witness, expressed in his affidavit his understanding was that since July 2015, the entire Attorney General's Office was recused from any further involvement in the investigation of the redacted legislators. Chief Keel states that he had no contact or communication with the Attorney General's Office regarding the redacted legislators matter after July 17, 2015. Chief Keel's affidavit further provides he worked exclusively with Pascoe on the investigation, and when the need for a state grand jury proceeding became apparent, he and Pascoe reviewed "letters and correspondences," [sic] and agreed initiation of a state grand jury was authorized by the July 17, 2015, letter.

Further, prior to concerns being raised by individuals at the Attorney General's Office, Judge Newman and Clerk Parks accepted that Pascoe had the authority to act as the Attorney General in initiating the state grand jury investigation. Parks' affidavit to this Court states he swore Pascoe into the state grand jury investigation in the presence of Judge Newman, and signed subpoenas at Pascoe's request, as he was "under the impression that the investigation was authorized." Parks' affidavit explains that approximately one week later, on March 24, 2016, he sent a communication to Pascoe copying Judge Newman, explaining that due to myriad legal and procedural issues that had "surfaced," he would not be administering the oath to anyone involved in the case until the issues were resolved.[18]

---

[17] It is for this reason we find the transfer of authority was not governed by any doctrine related to agency, which provides for degrees of control between a principal and an agent. Rather, we find the preponderance of the evidence supports the conclusion that an unequivocal cession of authority occurred resulting in Pascoe maintaining the full authority of the Attorney General.

[18] Parks' actions gave rise to Pascoe's initial filing with this Court: the Petition for a Writ of Mandamus.

We find Pascoe has proven by a preponderance of the evidence that the Attorney General's Office in its entirety was recused from the redacted legislators investigation, and Pascoe was vested with the full authority to act as the Attorney General for the purpose of the investigation.

Wilson contends, however, that only the elected Attorney General may lawfully sign the authorization for a state grand jury investigation.

South Carolina Code Ann. § 14-7-1630(B) (Supp. 2015),[19] states:

> "When the Attorney General and the Chief of [SLED] consider a state grand jury necessary to enhance the effectiveness of investigative or prosecutorial procedures, the Attorney General may notify in writing to the chief administrative judge for general sessions in the judicial circuit in which he seeks to impanel a state grand jury that a state grand jury investigation is being initiated."

Wilson asserts that pursuant to § 14-7-1630(B), and under all circumstances, regardless of any firewall or disqualification, the elected Attorney General personally is the sole individual authorized to initiate a state grand jury investigation.  Specifically, Wilson argues his exclusive authority to initiate a state grand jury is non-delegable under § 14-7-1630(B), because other provisions of the State Grand Jury Act refer to the "Attorney General or his designee."  He contends that the absence of the term "designee" in the initiation statute should be read to require the Attorney General personally sign the state grand jury initiation request. We disagree.

It is incontrovertible § 14-7-1630(B), requires the signature of the Attorney General in the authorization of a state grand jury investigation; however, we find the strict interpretation of the term "Attorney General"—to require the personal signature of the elected office holder—would lead to an absurd result.  *See Kennedy v. S.C. Ret. Sys.*, 345 S.C. 339, 351, 549 S.E.2d 243, 249 (2001) (finding statutes should not be construed so as to lead to an absurd result (citation omitted)); *Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364,

---

[19] This 2015 version of the statute was in effect in March, 2016, when the issue of Pascoe's authority arose.

366 (1994) (citing *Stackhouse v. Cnty. Bd. of Comm'rs for Dillon Cnty.*, 86 S.C. 419, 422, 68 S.E. 561, 562 (1910) (holding regardless of how plain the ordinary meaning of the words in a statute, courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the General Assembly)).

Were we to hold that only the elected office holder is authorized to initiate a state grand jury investigation, then even where the Attorney General himself became the subject of an investigation, only he could initiate a state grand jury proceeding in the case against him. We conclude such a holding would lead to an absurd result. *See Kiriakides*, 312 S.C. at 275, 440 S.E.2d at 366 (holding if possible, the court will construe a statute so as to escape an absurdity and carry the intention into effect (citation omitted)). A similar absurd result would arise where the Attorney General resigned or was rendered incapacitated, the effect of which would be that no state grand jury could go forward pending the election of, and qualification of, his successor. *See id.* We find such absurd results could not have been intended by the General Assembly. *See State v. Cnty. of Florence*, 406 S.C. 169, 173, 749 S.E.2d 516, 518 (2013) ("The cardinal rule of statutory construction is a court must ascertain and give effect to the intent of the legislature"); *Kiriakides*, 312 S.C. at 275, 440 S.E.2d at 366 (finding regardless of how plain the ordinary meaning of the words in a statute, courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the General Assembly).

Further, we fail to see how a recused individual could authorize a state grand jury investigation having no knowledge of the facts or evidence in the case. In the instant case, it remains unclear whether anyone at the Attorney General's Office has any information regarding the investigation of the redacted legislators. To the contrary, according to Keel, no one at the Attorney General's Office was made privy to any information obtained by SLED relating to the redacted legislators investigation after July 17, 2015. The facts of the investigation were known only by Keel, Pascoe, and their investigators.

The purpose of § 14-7-1630(B), is to provide the mechanism for the initiation of a state grand jury proceeding. This responsibility should only be exercised by an individual with thorough knowledge of the investigation leading up to the request for a state grand jury. More to the point, how would an Attorney General firewalled from all aspects of an investigation possess the requisite knowledge as to whether subject matter jurisdiction lies with the state grand jury. *See, e.g., Ex*

*parte Harrell*, 409 S.C. at 70–71, 760 S.E.2d at 813 ("Relevant to this case, the subject matter jurisdiction of a state grand jury covers 'a crime, statutory, common law or other, involving public corruption as defined in [s]ection 14-7-1615, a crime, statutory, common law or other, arising  out of or in connection with a crime involving public corruption . . . , and any attempt, aiding, abetting, solicitation, or conspiracy to commit a crime, statutory, common law or other, involving public corruption. . . .'" (citing S.C. Code Ann. § 14-7-1630(A)(3) (Supp. 2013))); *see also* § 14-7-1630(B) (requiring the individual seeking authorization of the state grand jury investigation "allege the type of offenses to be inquired into and, in the case of [certain offenses], must allege that these offense may be of a multicounty nature or have transpired or are transpiring or have significance in more than one county of the State.").

As evidenced by the statute itself, a state grand jury proceeding is an investigatory tool which we find is available to the Attorney General or his designee vested with the authority over an investigation within the subject matter jurisdiction of the Act. *See* § 14-7-1630(B) (stating authorization of a state grand jury is proper where a state grand jury is necessary "*to enhance the effectiveness of investigative* or prosecutorial procedures" (emphasis supplied)); *see also The Perils of Parallel Civil and Criminal Proceedings: A Primer*, 10 No. 4 HEALTH LAW., 1, 4 (1998) ("One of the government's most powerful investigatory tools is the grand jury"); *cf. United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 419 (1983) (noting the concern of tempting prosecutors to manipulate the grand jury's "powerful investigative tools"). Finally, nothing in the statute requires *only* the elected Attorney General may authorize a state grand jury investigation.

We conclude the General Assembly intended that the individual acting with the authority of the Attorney General may lawfully seek to impanel a state grand jury. *See Cnty. of Florence*, 406 S.C. at 173, 749 S.E.2d at 518; *Kiriakides, Inc.*, 312 S.C. at 275, 440 S.E.2d at 366; c*f. Matter of Special Sept. 1978 Grand Jury (II)*, 590 F.2d 245 (7th Cir. 1979).

Accordingly, since we find Pascoe was acting with the authority of the Attorney General when he signed the initiation of the state grand jury investigation, we hold the initiation was lawful and valid.  Because we find Pascoe lawfully authorized the initiation of the state grand jury investigation, the Attorney General's purported termination of Pascoe after the initiation of the state grand jury was ineffective.

As to Pascoe's mandamus action, as noted *supra*, our rulings in the declaratory judgment action clarify the roles of the parties involved. Therefore, we need not issue a writ of mandamus.

The Declaratory Judgment is therefore

**ISSUED**

**BEATTY, KITTREDGE and HEARN, JJ., concur. FEW, J., dissenting in a separate opinion.**

**JUSTICE FEW:**   The Attorney General makes two arguments of law in defense of his decision to fire Solicitor Pascoe.  First, he contends a statute forbids a solicitor from suing the Attorney General.  Second, he contends the South Carolina Constitution gives him the absolute authority to supervise all criminal litigation, and thus to remove an appointed prosecutor when he deems it appropriate. Because I believe both arguments are valid, and because I believe the constitutional argument renders irrelevant any factual finding except an actual conflict of interest on the part of the Attorney General, I would not follow the approach chosen by the majority.  Rather, I would instruct the presiding judge of the circuit court to answer this key factual question—whether the Attorney General has an actual conflict of interest—after which the presiding judge may direct the proceedings accordingly.  In all likelihood, the result would be the same. However, because I believe the law requires we follow a different procedure to reach that point, I respectfully dissent.

South Carolina Code section 1-7-380 (2005) provides, "The several solicitors of the State shall not engage in litigation against the State or any of its departments." David M. Pascoe is a "solicitor," this is "litigation," and Pascoe "engaged" in it "against the State" by suing the Attorney General in this Court's original jurisdiction.  Pursuant to the plain language of section 1-7-380, I would dismiss the action.  The result of that dismissal would bring these issues before the presiding judge of the circuit court.[20]

Article V, section 24 of the Constitution of South Carolina provides, "The Attorney General shall be the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record."  In my opinion, "the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases" has the power to remove an appointed

---

[20] It makes little apparent sense that Pascoe cannot sue the Attorney General to resolve these issues, but he may ask the presiding judge in a pending case to do so. However, the language of section 1-7-380 is plain and unambiguous.  *See City of Myrtle Beach v. Tourism Expenditure Review Comm.*, 407 S.C. 298, 304, 755 S.E.2d 425, 428 (2014) ("The wisdom or folly of the Act is not for us to judge; we must enforce the Act as written."); *Busby v. State Farm Mut. Auto. Ins. Co.*, 280 S.C. 330, 337, 312 S.E.2d 716, 720 (Ct. App. 1984) ("The responsibility for the justice or wisdom of legislation rests exclusively with the legislature, whether or not we agree with the laws it enacts.").

prosecutor—even one to whom he had previously given complete discretion for the prosecution.  This constitutional authority should be subject only to (1) an express and unmistakable recusal of the office by the Attorney General himself—not by his assistants—with specific relinquishment of his article V, section 24 supervisory responsibility, or (2) the disqualification of the Attorney General by order of the court based on the Attorney General's concession or the court's finding of an actual conflict of interest.

The words written by the Attorney General and his assistants in the various emails and letters may be clear, but what they intended—and the legal significance of what they wrote—is far from clear.  The majority has done a thorough job analyzing the evidence, and its findings of fact are adequately supported by the evidence.[21]  However, I do not agree that the majority's findings of fact are

---

[21] We have the authority to find facts in our original jurisdiction.  *Sanford v. S.C. State Ethics Comm'n*, 385 S.C. 483, 497, 685 S.E.2d 600, 607, *opinion clarified*, 386 S.C. 274, 688 S.E.2d 120 (2009).  However, we have hardly ever done so.  In *Sanford*, the only case I have been able to find in which we made factual findings in our original jurisdiction, we examined the file from a State Ethics Commission investigation to determine whether a letter written by the Governor "constitute[d] a complete waiver of confidentiality" in the investigation.  385 S.C. at 493, 685 S.E.2d at 605.   In all other cases, we have used our original jurisdiction to resolve questions of law, and when fact-finding is necessary to determine the law, we have assigned the responsibility to find facts to a circuit court judge.  *See* S.C. Code Ann. § 14-3-340 (1977) ("Whenever in the course of any action or proceeding in the Supreme Court arising in the exercise of the original jurisdiction . . . an issue of fact shall arise . . . , or whenever the determination of any question of fact shall be necessary to the exercise of the jurisdiction conferred upon the Supreme Court, the court may frame an issue therein and certify the same to the circuit court . . . .").  *See also, e.g.*, *Ex parte Smith*, 407 S.C. 422, 422, 756 S.E.2d 386, 386 (2014) (stating "this Court granted the petition for original jurisdiction in this case and appointed the Honorable Clifton Newman to serve as special referee"); *Roberts v. LaConey*, 375 S.C. 97, 100, 650 S.E.2d 474, 475 (2007) (noting the Court "accepted this declaratory judgment matter in our original jurisdiction . . . [and] referred [it] to a Special Referee . . . to take evidence and issue a report containing proposed findings of fact "); *City of Columbia v. Tindal*, 43 S.C. 547, 554, 22 S.E. 341, 344 (1895) (in an action "in the original jurisdiction of this court," stating,

sufficient to resolve this case. First, the majority does not squarely address the key factual question in the case—the only factual question whose answer could disqualify the Attorney General without his consent—whether he actually has a conflict of interest. The Rules of Professional Conduct provide "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Rule 1.7, RPC, Rule 407, SCACR. When an attorney has a conflict of interest, a court has the power to remove the attorney from the action. *See State v. Wilson*, 387 S.C. 597, 599, 693 S.E.2d 923, 924 (2010) (the circuit court removed an assistant solicitor due to a conflict of interest, but we found the order was not immediately appealable); *State v. Justus*, 392 S.C. 416, 419-20, 709 S.E.2d 668, 670 (2011) (affirming the circuit court's removal of defense counsel due to a conflict of interest). The Attorney General told McIntosh he "might" have a conflict of interest; McIntosh later referred to a recusal, but did not state the Attorney General's or his actions were based on a conflict. With no concession or finding of a conflict of interest, this Court should not prevent the Attorney General from exercising his constitutional responsibility to supervise criminal prosecution and his authority to remove a prosecutor when he deems it appropriate.

Second, the majority places too much emphasis on the fact that the Attorney General gave Pascoe complete authority to prosecute the case. This is an important fact, and I agree with the majority that he did it. However, this fact does not negate the Attorney General's supervisory responsibility under article V, section 24 of the constitution. The Attorney General's power to assign solicitors to prosecute cases derives from statute. *See, e.g.*, S.C. Code Ann. 1-7-50 (2005) (stating the Attorney General must defend "any officer or employee of the State" and "[s]uch appearance may be by . . . any solicitor . . . when directed to do so by the Attorney General."); S.C. Code Ann. 1-7-320 (2005) ("Solicitors shall perform the duty of the Attorney General . . . whenever they shall be . . . required to do so; and they shall assist the Attorney General . . . in all suits of prosecution in behalf of this State when . . . called upon by the Attorney General."); S.C. Code Ann. 1-7-350 (2005) ("The several solicitors of the State shall, . . . as assigned by the Attorney General, represent in all matters, . . . [and] . . . they shall be subject to the call of the Attorney General, who shall have the exclusive right, in his discretion, to so assign them in case of the incapacity of the local solicitor or otherwise.").

---

"There being a necessity for some testimony, [the action] was referred, under an order from this court, to [a] special referee").

This statutory grant of power is subject to the provisions of the constitution, and thus the use of the power to assign a solicitor to prosecute a case cannot amount to a relinquishment of the Attorney General's responsibility under the constitution to supervise all criminal cases.

Third, the majority finds the Attorney General "unequivocally recused himself," and McIntosh and Waters made "unequivocal representations . . . in the July 2015 correspondence" by which McIntosh "recused himself and the Attorney General's Office." These are also important facts, and I cannot disagree with the majority that is what happened. However, I do not agree that either action was "unequivocal." Rather, the evidence is contradictory, and the subsequent actions of McIntosh, Cook, Waters, *and* Pascoe indicate none of them believed the Attorney General or McIntosh intended to relinquish the supervisory responsibilities set forth in article V, section 24. This uncertainty is important to the constitutional analysis, as I believe this Court should not find that the Attorney General relinquished this responsibility unless the actions he took to do so were his own actions, and were, in fact, unequivocal.

I will summarize some of the evidence to illustrate my point. On October 2, 2014, the Attorney General wrote an email to McIntosh stating, "Please ensure that I am firewalled from any involvement in that specific instance" and "I want you to take over as supervising prosecutor." In this email, the Attorney General placed McIntosh in charge of the case, thus intentionally keeping the office of the Attorney General involved in the investigation and prosecution. As the majority finds, "McIntosh accepted the designation as supervising prosecutor." The record before us does not contain any evidence of other action regarding recusal taken by the Attorney General himself after the October 2 email, and McIntosh appears to explain in an affidavit that the October 2 email was the only communication he received from the Attorney General on the subject. Everything else relied on by the majority for its finding that the entire office was recused consists only of actions taken by McIntosh, Cook, or Waters. In particular, the July 2015 correspondence came from McIntosh and Waters—not directly from the Attorney General.

In addition, the July 2015 correspondence is internally inconsistent as to whether the office was recused. McIntosh's July 17 letter was written to Chief Keel referencing what appears to be a follow-up investigation of persons mentioned in the SLED report. Despite the "recused this office" statement, McIntosh "request[ed] that, upon completion of the investigation of those persons, the report

be forwarded" to Pascoe.  The action of directing the future delivery of an uncompleted report is inconsistent with the office being recused.

Moreover, the "recused this office" statement is inconsistent with the Attorney General putting McIntosh in charge by the October 2, 2014 email, particularly his telling McIntosh to "ensure that I am firewalled."  The July 24 letter from Waters to Pascoe also states the Attorney General "firewalled" himself.  The act of firewalling might be equivalent to the recusal of an individual, but it is the opposite of recusing an entire office.[22]  The purpose of a firewall is to enable the rest of an office to continue working on the matter despite one lawyer's conflict.  Finally, like McIntosh's July 17 letter, Waters' letter shows the continued involvement of the office because it informs Pascoe that at McIntosh's direction he will receive the "results of any further investigation" from Chief Keel.

Further, McIntosh, Cook, and Waters continued their involvement in the case long after July.  McIntosh wrote Pascoe on September 17, 2015 describing "considerable discussion" between the Attorney General's office and law enforcement.  Apparently exercising the "supervising prosecutor" authority the Attorney General gave him in October 2014, McIntosh admonished Pascoe "the public must have every confidence that the integrity of the criminal process is protected."  On September 27, 2015, Cook emailed Pascoe stating, "The [Attorney General], as Chief Prosecutor, always retains authority over that integrity of a

---

[22] The term "firewall" is used to describe a hypothetical barrier placed between a lawyer and the remainder of the lawyer's firm or office to prevent the lawyer's conflict of interest from being imputed to the entire organization.  *See, e.g.*, *In re Shared Memory Graphics LLC*, 659 F.3d 1336, 1342 (Fed. Cir. 2011) ("Nor is it disputed that after Cooper joined the law firm of Floyd and Buss, the firm was and is representing parties adverse to [his former client].  The firm did not take any steps to exclude Cooper from the firm's activities in this lawsuit; there is no representation that the traditional 'firewall' was erected.").  The term "firewalled" is synonymous with "screened" in our Rules of Professional Conduct.  *See* Rule 1.0(n), RPC, Rule 407, SCRCP (defining "Screened" as "the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law").

criminal investigation even in a matter in which he is not involved." On September 30, 2015, McIntosh wrote a letter to Pascoe in which he denied the office has a conflict of interest and offered to "assist you any way possible as to legal research." An office does not do legal research in a matter as to which the office is unequivocally recused.

Pascoe accepted the involvement of the Attorney General's office after the July 2015 correspondence. For example, Pascoe emailed Creighton Waters on July 27, 2015 stating, "I will . . . call later today or in the morning for some clarification." On September 15, 2015, Pascoe emailed Cook asking if the Attorney General's office ever dealt with a legal issue Pascoe faced in his investigation of the redacted portions of the SLED report. There is considerable email correspondence between Pascoe and Cook in September, much of which is arguably unrelated to the investigation. On October 21 and 23, 2015, however, Pascoe wrote Cook and officially requested two advisory opinions on matters related directly to the investigation.[23] Pascoe stated, "Bob, I want to thank you for taking the time to meet with me last week. I always value your opinion and advice. Per our discussion, I need your opinion on two issues dealing with South Carolina Code Section 8-13-700," which is entitled in part, "Use of official position or office for financial gain"—the subject of Pascoe's investigation. On November 16, 2015, Pascoe emailed Cook asking, "I was just wondering if you are making any pro[gress] on the issues I asked you to look into and give me an opinion." Cook delivered his opinion on December 11, 2015 via email. Pascoe responded, "I will call you next week after I have an opportunity to review it . . . so I can pick your brain."

Finally, Pascoe wrote McIntosh on September 25, 2015 and stated "it is imperative that the Attorney General's Office recuse itself," indicating Pascoe did not believe the office had already done so. These facts and others are inconsistent with a finding that the Attorney General and McIntosh intentionally and unequivocally relinquished the duty to supervise this case under article V, section 24 of the constitution.

In my opinion, the lack of action by the Attorney General himself in recusing the office, the confusion as to whether the July 2015 correspondence was in fact a recusal of the office, and the subsequent behavior of those involved indicating they did not think so are critical to the analysis of whether the Attorney General

---

[23] *See supra* note 8.

retained or relinquished his constitutional responsibility under article V, section 24. If we are going to find that the Attorney General forfeited his constitutional duty to supervise all criminal prosecutions, we ought to do so only on the basis of the Attorney General's own actions that are in fact clear. By allowing the imprecise and internally inconsistent writing of two assistants—months after the Attorney General ceased communication with them about the case—to constitute the forfeiture of the responsibilities of a constitutional officer, we set a dangerous precedent. This and other constitutional responsibilities are too important for this Court to allow their forfeiture on imprecise and inconsistent statements made by unelected subordinates to constitutional officers.

By requiring the presiding judge of the circuit court to answer the key factual question of whether the Attorney General has an actual conflict of interest, and permitting the presiding judge to thereafter direct the proceedings accordingly, we comply with section 1-7-380, we enable a more precise fact-finding inquiry than this Court can conduct on the record before us, and we ensure the responsibility imposed on the Attorney General by article V, section 24 of the constitution to "supervise the prosecution of all criminal cases" is honored unless he actually has a conflict of interest that prevents him from doing so. *See also* S.C. Code Ann. § 14-7-1650(C)(2) (Supp. 2014) ("Any doubt regarding disqualification [of the Attorney General] shall be resolved by the presiding judge of the state grand jury."). I respectfully argue that this is the procedure we should follow.