# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

James H. Harrison, Appellant.

Appellate Case No. 2018-002128

_____

Appeal from Richland County
Carmen T. Mullen, Circuit Court Judge

_____

Opinion No. 28005
Heard June 11, 2020 – Filed January 20, 2021

_____

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

_____

Elizabeth Van Doren Gray, Robert E. Stepp, and
Vordman Carlisle Traywick III, all of Robinson Gray
Stepp & Laffitte, LLC, of Columbia for Appellant.

First Circuit Solicitor David M. Pascoe Jr., of
Orangeburg, and Assistant Solicitor W. Baker Allen Jr.,
of St. George, both for Respondent.

_____

**JUSTICE KITTREDGE:** Appellant James H. Harrison, a former state legislator, was convicted and sentenced to eighteen months' imprisonment in a public corruption probe. The case was prosecuted by David Pascoe, Solicitor of the First Judicial Circuit, who was serving as the acting Attorney General. As recognized

by this Court in *Pascoe v. Wilson*,[1] Solicitor Pascoe's authority to pursue the corruption probe was bestowed on him by South Carolina's current Attorney General, Alan Wilson. The extent of the power granted to Solicitor Pascoe lies at the heart of this appeal. Appellant contends Solicitor Pascoe's authority did not grant the solicitor the power to investigate or prosecute him (Appellant). Conversely, Solicitor Pascoe dismisses any suggestion that his authority was limited, for he contends he had the authority to prosecute public corruption wherever the investigation led. For the reasons we will explain, Solicitor Pascoe had the authority to prosecute Appellant for perjury, but did not have the authority to prosecute Appellant for misconduct in office. Consequently, we affirm Appellant's conviction and eighteen-month sentence for perjury, but reverse the statutory and common law misconduct in office charges and remand to the presiding judge of the State Grand Jury for further proceedings.

This is a difficult case, one that has resulted in a sharply divided Court. This is the lead opinion of the Court. With the Court's three separate writings in this case, there are:

(1) four votes to affirm Appellant's perjury conviction (Chief Justice Beatty, Justice Kittredge, Justice Hearn, and Justice Few); and

(2) three votes to reverse and remand the misconduct charges (Justice Kittredge, Justice Few, and Justice James).

Justice Hearn, joined by Chief Justice Beatty, would affirm all of Appellant's convictions, thus adopting Solicitor Pascoe's position that our decision in *Pascoe* granted him boundless authority to pursue and prosecute public corruption in South Carolina. Justice James would reverse and remand all of Appellant's convictions based on Solicitor Pascoe's clear lack of authority beyond that spelled out in *Pascoe*. Despite the fact that both separate writings are concurring dissents, we will refer to Justice Hearn's writing as the dissent and Justice James's writing as the concurrence, because Justice James's writing most closely resembles the lead opinion.[2]

---

[1] 416 S.C. 628, 788 S.E.2d 686 (2016).

[2] As a practical matter, the divergent views of the Court may appear to be much ado about nothing, for—following the result of our decision here—Appellant must serve the maximum eighteen-month sentence imposed by the circuit court. The circuit court directed the sentences on the misconduct convictions be served

**I.**

The duly elected Attorney General for South Carolina is Alan Wilson. The South Carolina Attorney General is imbued by our state constitution with substantial authority over the prosecution of criminal cases. S.C. Const. art. V, § 24. To that end, the Attorney General has the constitutional duty to supervise all criminal prosecutions and ensure all laws be faithfully executed, as well as the statutory duty to direct the state solicitors, including the ability to assign solicitors to assist in matters outside of their respective judicial circuits. *See, e.g.*, S.C. Const. art. IV, § 15; S.C. Const. art. V, § 24; S.C. Code Ann. § 1-7-50 (2005); *id.* § 1-7-100(2) (2005); *id.* § 1-7-320 (2005); *id.* § 1-7-350 (2005); *Ex parte McLeod*, 272 S.C. 373, 377, 252 S.E.2d 126, 127 (1979).

David Pascoe is the duly elected Solicitor for South Carolina's First Judicial Circuit, which comprises Orangeburg, Calhoun, and Dorchester Counties. *See* S.C. Const. art. V, § 24 (providing that "in each judicial circuit a solicitor shall be elected by the electors thereof. . . . The General Assembly shall provide by law for their duties and compensation."). Section 1-7-350 of the South Carolina Code sets forth some of the duties of local solicitors:

> The several solicitors of the State shall, within their respective circuits, in cooperation with, and as assigned by the Attorney General, represent in all matters, both civil and criminal, all institutions, departments, and agencies of the State. *Likewise in criminal matters outside their circuits,* and in extradition proceedings in other states, *they shall be subject to the call of the Attorney General,* **who shall have the exclusive right, in his discretion,** *to assign them in case of the incapacity of the local solicitor or otherwise.*

(Emphasis added).

As set forth in detail in our decision in *Pascoe*, Attorney General Wilson originally appointed Solicitor Pascoe to serve as the "designated prosecutor" in the investigation and prosecution of Robert Harrell, who, at the time of the solicitor's appointment, was under investigation for alleged crimes committed in his capacity as a legislator. 416 S.C. at 631, 788 S.E.2d at 688. A report generated by the South Carolina Law Enforcement Division (SLED) during the Harrell investigation contained the redacted names of two legislators who also were allegedly implicated

---

concurrently with the eighteen-month sentence on the perjury conviction.

in illegal conduct. *Id.* We now know those legislators to be James Merrill and Richard Quinn Jr. (Quinn Jr.). The SLED report additionally referenced and incorporated the businesses of the two redacted legislators because it appeared the businesses had been used by the two legislators in derogation of state law. For example, the investigation of Quinn Jr. necessarily included an investigation into businesses in which he allegedly had an interest, specifically, Richard Quinn & Associates (RQA), First Impressions, Mail Marketing Strategies, and the Copy Shop.

Solicitor Pascoe contacted Attorney General Wilson and indicated his belief that the redacted legislators should be investigated as part of "any corruption probe on the legislature." *Id.* In response, Attorney General Wilson emailed the Chief Deputy Attorney General, John McIntosh, stating he (Wilson) had a possible conflict of interest between "[him]self and members of the [H]ouse." *Id.* The Attorney General therefore asked McIntosh to "firewall" him from any involvement and "take over as supervising prosecutor." *Id.* at 631–32, 788 S.E.2d at 688.

Several months later, McIntosh emailed the Chief of SLED, asking that he forward the SLED report involving the redacted legislators to Solicitor Pascoe "for a prosecutive decision." *Id.* at 632, 788 S.E.2d at 688 (internal quotation marks omitted). The email further stated that the Attorney General had "recused th[e entire] office from the legislative members in the redacted portions of the SLED report" but had *not* recused the office from "any other matters." *Id.* (emphasis omitted).[3]

Eventually, following the SLED investigation, Solicitor Pascoe sought to impanel the State Grand Jury. *Id.* at 637, 788 S.E.2d at 691. Due to a deterioration of the relationship between Attorney General Wilson and Solicitor Pascoe, the Attorney General's Office opposed the solicitor's request, and, as a result, the Clerk of the State Grand Jury refused to swear-in the solicitor's staff. *Id.* at 638, 788 S.E.2d at 691–92. Solicitor Pascoe responded by filing a petition for declaratory relief with this Court. *Id.* at 639, 788 S.E.2d at 692. As part of Solicitor Pascoe's petition, he

---

[3] Likewise, a few days later, the Assistant Deputy Attorney General Creighton Waters sent an email to Solicitor Pascoe stating, in relevant part, "As you are aware, several months ago the Attorney General firewalled himself from any involvement into the investigation of certain individuals covered in the still-redacted portion of the SLED report. *This recusal was limited only to those named individuals*." (Emphasis added.)

admitted that "the nature of the Attorney General's conflict [] [wa]s not known" at the time of the Court's decision.[4]

The Court accepted Attorney General Wilson's recusal and ruled accordingly, granting Solicitor Pascoe's requested relief and finding "Pascoe [] met his burden of proving by a preponderance of the evidence he was vested with the authority to act as the Attorney General in the redacted legislators matter, and that this authority necessarily included the power to initiate a state grand jury investigation." *Id.* at 640, 788 S.E.2d at 692. In its analysis, the Court referred repeatedly to the "redacted legislators matter" or the "redacted legislators investigation," using those phrases to define the scope of the recusal of the Attorney General's Office and Solicitor Pascoe's authority. *See, e.g., id.* at 642–44 & nn. 15–16, 788 S.E.2d at 693–95 & nn.15–16 ("Further, we find the preponderance of the evidence supports two conclusions: that Wilson unequivocally recused himself from any aspect of *the redacted legislators investigation* . . . ; and, subsequently, that McIntosh, acting as the Attorney General, recused himself and the Attorney General's Office *from the redacted legislators investigation*, and *appointed Pascoe to act as the Attorney General vested with the Attorney General's power and authority for the purpose of that investigation* . . . ." (emphasis added)).

Ultimately, the Court

> conclude[d] the General Assembly intended that the individual acting with the authority of the Attorney General may lawfully seek to impanel a state grand jury.
>
> Accordingly, since [the Court found] Pascoe was acting with the authority of the Attorney General when he signed the initiation of the state grand jury investigation, [the Court held] the initiation was lawful and valid.

*Id.* at 647, 788 S.E.2d at 696 (internal citations omitted).

---

[4] According to representations made by Solicitor Pascoe during oral arguments in the instant matter, Attorney General Wilson's alleged conflict is now known to Solicitor Pascoe and is somehow connected to Quinn Jr., his father Richard Quinn Sr. (Quinn Sr.), and RQA.

## II.

Subsequently, during the investigation into Quinn Jr., investigators learned RQA received significant retainer income from a number of lobbyist's principals and that RQA, in turn, made regular payments to legislators, including Appellant. Appellant testified about these payments before the State Grand Jury,[5] and he concedes Solicitor Pascoe had the authority to require him to appear and testify before the grand jury for that purpose. It was Appellant's grand jury testimony that resulted in the perjury charge.

During Appellant's grand jury testimony, the focus of the questioning was on the dubious payments from RQA and, specifically, the work Appellant performed on RQA's behalf. *See* S.C. Code Ann. § 2-17-110(G) (2005) ("A lobbyist, a lobbyist's principal, or a person acting on behalf of a lobbyist or a lobbyist's principal may not employ on retainer a public official, a public employee, . . . or a firm or organization in which the public official or public employee has an economic interest."). Appellant stated Quinn Sr. approached him in 2000 and asked him to assist with campaigns for various politicians working with RQA, including "developing issues . . . that a candidate should run on," "conduct[ing] polling," and "work[ing] on mail pieces to send out to the district."[6] Appellant explained that "as long as [he] worked on campaigns and nothing more, that [he] didn't feel [he] had a conflict of interest."

Appellant testified that, for his first ten years with RQA, he was a salaried employee who earned over $80,000 per year. However, beginning in Fall 2010, Quinn Sr.

> asked me if I would consider going off-payroll and becom[ing] a contract consultant. And I did that. And we discussed, because I was not available as much as maybe I had been early, that my salary was

---

[5] At the time Appellant testified before the State Grand Jury, investigators knew only that Appellant had received regular payments from RQA between 2010 and 2012. Prior to 2010, Appellant was paid in a different manner, and, thus, the full extent of his financial relationship with RQA was unknown at the time of his grand jury testimony.

[6] During this time period, Appellant also served as the Chairman of the House Judiciary Committee in the General Assembly and was a full-time practicing attorney.

significantly reduced [to $2,000 per month (i.e., $24,000 per year)] because I acknowledged to them that I didn't think I could put the time into it that we initially had agreed that I would do.

Appellant was paid over $800,000 by RQA between 2000 and 2012.

Solicitor Pascoe became suspicious Appellant's testimony was untruthful because (1) "Appellant admitted he was aware RQA represented lobbyist's principals"; (2) "campaigns aren't year-round," (3) the State Grand Jury "would later hear testimony from numerous individuals associated with RQA that they had never seen Appellant do any work [on campaigns] and most did not even know that Appellant was working for RQA";[7] and (4) "In light of [Appellant's] assertion that he believed his primary job was as an attorney, it was reasonable to wonder how someone who operated a full-time legal practice and served as the Chairman of the House Judiciary Committee could find the time to also serve as a salaried employee of RQA."

According to Solicitor Pascoe, these suspicions, and the pattern of incoming and outgoing payments from RQA to various legislators, "gave rise to strong suspicion of possible crimes under the State Ethics Act and merited further investigation." For example, Appellant did not disclose his association with RQA or lobbyist's principals on his statements of economic interest (SEIs) except during his first year of employment with RQA. *See, e.g.*, S.C. Code Ann. § 2-17-110(G); *id.* § 8-13-1130 (2019) (requiring, *inter alia*, legislators to report on their SEIs the names of lobbyists or lobbyist's principals who had purchased goods or services in an amount of at least $200 from the legislator, the legislator's immediate family, an individual with whom the legislator is associated, or a business with which the legislator is associated). As a result, Solicitor Pascoe notified the presiding judge of the State Grand Jury that the grand jury's area of inquiry was being expanded beyond Quinn Jr. and RQA to include Appellant and other legislators. *See id.* § 14-7-1690 (2017) ("Once a state grand jury has entered into a term, the Attorney General or solicitor, in the appropriate case, may notify the presiding judge in

---

[7] For example, Appellant testified that—while he could not remember the vast majority of the politicians whose campaigns he had worked on during his twelve years with RQA—he specifically recalled working on Senator John McCain's campaigns for President in 2000 and 2008, and (now-Governor) Henry McMaster's campaigns for attorney general. However, a former employee of RQA that was directly responsible for the McCain and McMaster campaigns later testified he was entirely unaware of Appellant being involved in any capacity on those campaigns.

writing as often as is necessary and appropriate that the state grand jury's areas of inquiry have been expanded or additional areas of inquiry have been added thereto.").

Further investigation led Solicitor Pascoe and, ultimately, the State Grand Jury to believe that Appellant had not been truthful during his testimony before the grand jury. Among other evidence unearthed, there were emails from Quinn Sr. indicating that Appellant was not paid by RQA for his work on campaigns, RQA financial records showing that Appellant's pay was linked directly to lobbyist's principals' fees, and a letter from Appellant to the House Legislative Ethics Committee stating Appellant had "recently accepted the position of Partner and Chief Operating Officer with" RQA.[8]

---

[8] The letter additionally stated,

> As a way of background, [RQA] manages election campaigns for candidates for various federal, state and local offices and, in addition, the firm provides public relations and communications services for its corporate clients, several of whom are registered as lobbyist principals. *As Chief Operating Officer (a salaried position), my responsibilities would include managing the day-to-day operations of the firm, as well as providing public relations/corporate communications services for its clients. From time to time, these services may include contact with various federal, state and local government agencies.* However, under no circumstances would they include "lobbying" as defined in Section 2-17-10(12).

(Emphasis added.) Further, the partnership agreement between RQA and Appellant specifically listed the corporate clients for which Appellant would be responsible—including SCANA, Bell South, the Palmetto Health Alliance, and Unisys—and his responsibilities to those clients, including "plan development and plan execution of office organization systems, book keeping systems, client services systems and business development." Nowhere was there a mention of working on campaigns on behalf of RQA.

The State Grand Jury ultimately indicted Appellant for perjury,[9] common law misconduct in office,[10] statutory misconduct in office,[11] and conspiracy.[12]

Following his indictments, Appellant challenged Solicitor Pascoe's authority via two motions to dismiss. In relevant part, Appellant argued that Solicitor Pascoe's authority to serve as the acting Attorney General was limited to the redacted legislators alone. Appellant contended that, because Solicitor Pascoe and the State Grand Jury only had the authority to investigate Merrill and Quinn Jr. and their respective legislative business dealings, the grand jury's indictment of Appellant was invalid. Moreover, according to Appellant, the infirmity in the solicitor's and the State Grand Jury's authority to indict him deprived the circuit court of subject matter jurisdiction over Appellant's criminal trial. The circuit court denied the motions to dismiss, and, ultimately, Appellant was convicted of perjury and statutory and common law misconduct in office. Appellant was acquitted on the conspiracy charge.

---

[9] *See* S.C. Code Ann. § 16-9-10(A)(1) (2015) ("It is unlawful for a person to willfully give false, misleading, or incomplete testimony under oath in any court of record, judicial, administrative, or regulatory proceeding in this State.").

[10] *See State v. Hess*, 279 S.C. 14, 20, 301 S.E.2d 547, 551 (1983) ("Misconduct includes any act, any omission, in breach of duty of public concern by persons in public office provided it is done [willfully] and dishonestly."); *State v. Lyles-Gray*, 328 S.C. 458, 465–66, 492 S.E.2d 802, 806 (Ct. App. 1997) ("Misconduct in office occurs when persons in public office fail to properly and faithfully discharge a duty imposed by law."). Common law misconduct in office carries a penalty of up to ten years' imprisonment.

[11] *See* S.C. Code Ann. § 8-1-80 (2019) ("Any public officer whose authority is limited to a single election or judicial district who is guilty of any official misconduct, habitual negligence, habitual drunkenness, corruption, fraud, or oppression shall be liable to indictment and, upon conviction thereof, shall be fined not more than one thousand dollars and imprisoned not more than one year.").

[12] The misconduct in office and conspiracy charges all stemmed from allegations that Appellant was paid by lobbyist's principals with RQA acting as a conduit for the payments; failed to report these transactions and relationships on his SEIs; and allegedly influenced legislation beneficial to those lobbyist-principals in a variety of fashions.

# III.

On appeal, Appellant again focuses on Solicitor Pascoe's lack of authority, claiming his power to serve as the acting Attorney General was limited by Attorney General Wilson and this Court to the investigation and prosecution of the redacted legislators alone. As such, Appellant argues, the State Grand Jury that investigated and indicted him was unlawfully convened, and any indictments related to him that were handed down by that State Grand Jury are a nullity.[13]

As we discuss more fully below, we conclude Solicitor Pascoe's borrowed authority to act as the Attorney General did not extend so far as to allow him to independently investigate and prosecute Appellant absent further delegation from Attorney General Wilson. However, Appellant's perjury indictment was within the

---

[13] Appellant also contends the indictments were insufficient to have put him on notice so as to prepare a defense. We find this argument to be unpreserved and, in any event, manifestly without merit. *See* S.C. Code Ann. §§ 14-7-1700, -1720(A)(4) (2017) (entitling a defendant to receive a copy of the state grand jury proceedings, excluding the portions related to its deliberations and vote); *State v. Gunn*, 313 S.C. 124, 130, 437 S.E.2d 75, 78 (1993) ("It is well settled, however, that in viewing the sufficiency of an indictment we must look at the issue with a practical eye in view of the surrounding circumstances. This indictment was returned by the State Grand Jury. Under its specialized procedure, a defendant is permitted to review, and to reproduce, the transcript of the testimony of the witnesses who appeared before the Grand Jury. In light of the availability of this evidence to these appellants, we hold that this count of the indictment is not fatally vague or overbroad." (internal citations omitted)); *see also State v. Evans*, 322 S.C. 78, 82 n.1, 470 S.E.2d 97, 99 n.1 (1996) ("As we noted in *State v. Gunn*, *supra*, the State Grand Jury operates under a very specialized procedure under which a defendant is permitted to obtain and review all evidence which was considered in handing down an indictment. Accordingly, [the defendant] had an opportunity to review the evidence to determine whether the State Grand Jury, in fact, investigated him for [the particular aspect of his indictment he challenged on appeal]. At no time has he challenged the sufficiency of the evidence which was before that body, nor is there any evidence in the record before us. If [the defendant] was concerned with the evidence which was considered by the State Grand Jury, it was incumbent upon him to challenge this evidence prior to a jury being sworn." (internal citation omitted)); *cf. State v. Thrift*, 312 S.C. 282, 302, 440 S.E.2d 341, 352 (1994) ("Ordinarily, we do not inquire into the nature or sufficiency of the evidence before a grand jury.").

scope of Solicitor Pascoe's authority.  As a result, we affirm Appellant's conviction and sentence for perjury committed before the State Grand Jury.

**A.**

***Any delegation of the Attorney General's authority must be clear and unequivocal.***

As noted, the Attorney General of South Carolina is the state's chief prosecutor and, pursuant to our state constitution, possesses substantial authority over the prosecution of criminal cases.  *See* S.C. Const. art. V, § 24.[14]  In return, the Attorney General is accountable to the people of South Carolina.  S.C. Const. art. VI, § 7 (stating the Attorney General is elected by popular vote); *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 643, 528 S.E.2d 647, 651 (1999) ("All power is derived from the people, and all . . . officers of government are their agents, and at all times accountable to them." (citation omitted)).

The constitutional structure of the Office of the Attorney General makes clear that the Attorney General is imbued with substantial responsibilities that lie at the heart of our state's criminal justice system.  It is thus essential that courts exercise restraint in curtailing the Attorney General's authority.  In that vein, any delegation of the Attorney General's authority must be clear and unequivocal.  *See Pascoe*, 416 S.C. at 648, 653–54, 788 S.E.2d at 697, 700 (Few, J., dissenting) (opining that the Attorney General's "constitutional authority should be subject only to (1) an express and unmistakable recusal of the office by the Attorney General . . . with specific relinquishment of his article V, section 24 supervisory responsibility, or (2) the disqualification of the Attorney General by order of the court based on the Attorney General's concession or the court's finding of an actual conflict of interest").  If there is any doubt about the scope of the delegation of power, that doubt must first be addressed by the Attorney General, and only then, when necessary, a court of competent jurisdiction in the context of a justiciable controversy.  *Id.* (Few, J., dissenting).

Our decision in *Pascoe* directly addressed the scope of Attorney General Wilson's recusal and the resultant, limited scope of Solicitor Pascoe's ability to act as the

---

[14] *But see also State ex rel. McLeod v. Snipes*, 266 S.C. 415, 420, 223 S.E.2d 853, 855 (1976) (noting that solicitors are popularly elected constitutional officers as well and "maintain a strong measure of independence" within their respective circuits).

Attorney General. That decision speaks for itself, leading to only one conclusion: Solicitor Pascoe's authority was limited by Attorney General Wilson and the Attorney General's Office to the investigation and prosecution of the redacted legislators—Merrill and Quinn Jr.—alone. As we noted above, McIntosh, while acting as the Attorney General, emailed the Chief of SLED and specifically stated, "As you are aware, the Attorney General recused this office from *the legislative members in the redacted portions of the SLED report **but has not recused this office from any other matters***." *Id.* at 632, 788 S.E.2d at 688 (emphasis in original omitted, new emphasis added). At that time, Merrill and Quinn Jr. were the only "legislative members in the redacted portions of the SLED report." *Id.* From this email, the Court concluded that "McIntosh, acting as the Attorney General, recused himself and the Attorney General's Office *from the redacted legislators investigation*, and appointed Pascoe to act as the Attorney General vested with the Attorney General's power and authority for the purpose of *that investigation*." *Id.* at 642, 788 S.E.2d at 694 (emphasis added). However, McIntosh specifically declined to recuse the Attorney General's Office from "any other matters," i.e., from an investigation into any other legislators that stemmed from the SLED report.[15]

Solicitor Pascoe argues this Court's decision in *Pascoe* granted him boundless authority to investigate and prosecute public corruption wherever he found it—a position with which the dissent agrees. The dissent rewrites *Pascoe* to remove the clear boundaries this Court imposed on Solicitor Pascoe's authority to act as the Attorney General. We are told by the dissent that the Court's holding and repeated references to the redacted legislators in *Pascoe* were "simply a description of the investigation," and the "investigation" should be broadly construed to include public corruption wherever Solicitor Pascoe found it. In our judgment, that is not the correct legal view. We believe the dissent itself proves our point: "While it is true that we referred to the investigation as the 'redacted legislators matter,' the use of that phrase was simply a description of the investigation *at that time*." We agree insofar as our decision in *Pascoe* decided the specific case presented to us "at that

---

[15] This limited scope of recusal was reiterated to Solicitor Pascoe via an email from Waters to him, in which Waters stated, "As you are aware, several months ago the Attorney General firewalled himself from any involvement into the investigation of certain individuals covered in the still-redacted portion of the SLED report. *This recusal was limited only to those named individuals*." (Emphasis added.) The dissent's effort to put its spin on the communications from McIntosh and Waters falls flat.

time." That is what courts do. Courts do not give advisory opinions or answer questions that are not asked. *See, e.g.*, *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216 n.4, 734 S.E.2d 142, 145 n.4 (2012) ("We decline, as we must, to [rule on issues] not presented to us. Appellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked." (internal alteration and quotation marks omitted) (citation omitted)).

The universal condemnation of public corruption may make it inviting to recast this Court's limited holding in *Pascoe*. Indeed, the dissent treats the reader to generalities about the evils of public corruption—with which we agree—including theatrics borrowed from the Watergate era to "follow the money." The scintillating directive to "follow the money" may be irresistible to a journalist or a prosecutor. But we are not journalists, and we are not prosecutors. We are judges, and our duty is to follow the rule of law. As a Court, our judicial responsibility requires us to honor the holding in *Pascoe* and, thus, recognize the clear and unmistakable limitations on Solicitor Pascoe's authority. That authority extended to the two redacted legislators and the businesses suspected of being used by them in derogation of state law—nothing more, nothing less. While the dissenting Justices may regret the clear boundaries in the Court's opinion limiting Solicitor Pascoe's authority, they cannot wish them away or pretend they do not exist.[16]

---

[16] The dissent's attempts to diminish the significance of the communications from McIntosh and Waters to Solicitor Pascoe are a prime example of its wishful revisionist thinking. The dissent states that "these communications occurred nearly nine months after the Attorney General recused himself, and I would not find any subsequent attempt to narrow that recusal dispositive." The focus on the timing of the communications entirely misses their significance. Attorney General Wilson recused himself in October 2014, appointing McIntosh as the acting Attorney General. In turn, McIntosh recused the entire Attorney General's Office in July 2015, thus transferring the authority to pursue the redacted legislators investigation to Solicitor Pascoe. With respect to that investigation, the solicitor had no authority at all in the nine months between Attorney General Wilson's recusal and McIntosh's decision to recuse the entire Attorney General's Office. Thus, the communications from McIntosh and Waters to Solicitor Pascoe were crucial because they were what gave Pascoe the official authority to pursue the state grand jury probe. Necessarily then, those communications *are critical evidence* that define the scope of the grant of authority to the solicitor. The dissent's myopic focus on the timing of the communications demonstrates a fundamental misunderstanding of the sequence of events in *Pascoe*, as well as the legal

Contrary to Solicitor Pascoe's position, this Court did not grant him unlimited authority to conduct a broad-sweeping statehouse corruption probe, nor could we have done so without running afoul of the state constitution. *See* S.C. Const. art. V, § 24 ("The Attorney General shall be the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record."). Rather, the Court decided the issue before it at the time, which was the scope of the Attorney General's Office's recusal and Solicitor Pascoe's resultant authority. The Court limited its decision to the matter at issue at the time—the investigation and prosecution of the redacted legislators (Merrill and Quinn Jr.) only. *See, e.g., id.* at 632, 788 S.E.2d at 688 ("It is unclear from the evidence before this Court whether the initial Harrell investigation led to further investigations beyond that of the redacted legislators."). Solicitor Pascoe's effort to recast the holding in *Pascoe* and broaden his authority is anathema to the rule of law and is rejected.[17]

---

significance the Court placed on those events. *See, e.g., Pascoe*, 416 S.C. at 640–41, 788 S.E.2d at 693 (discussing the dates and legal efficacy of the transfer of authority from Attorney General Wilson to McIntosh to Solicitor Pascoe).

[17] To his credit, Justice Few well understood long ago the grave importance of proceeding cautiously in delegating the constitutional authority of the people's elected Attorney General. *See Pascoe*, 416 S.C. at 651, 654, 788 S.E.2d at 698, 700 (Few, J., dissenting) (noting "the subsequent actions of [the Attorney General's Office] **and Pascoe** indicate none of them believed the Attorney General or McIntosh intended to relinquish the supervisory responsibilities set forth in article V, section 24 [of the state constitution]. . . . If we are going to find that the Attorney General forfeited his constitutional duty to supervise all criminal prosecutions, we ought to do so only on the basis of the Attorney General's own actions that are in fact clear. By allowing the imprecise and internally inconsistent writing of two assistants—months after the Attorney General ceased communication with them about the case—to constitute the forfeiture of the responsibilities of a constitutional officer, we set a dangerous precedent. This and other constitutional responsibilities are too important for this Court to allow their forfeiture on imprecise and inconsistent statements made by unelected subordinates to constitutional officers." (bold emphasis added)); *see also State v. Quinn*, 430 S.C. 115, 135, 843 S.E.2d 355, 366 (2020) (Few, J., concurring) ("It is clear that the result of the majority's decision in *Pascoe v. Wilson* led us directly to the problems we now face in this case [and *Harrison*]. Pascoe's prosecution of Quinn [Jr.], [] Quinn Sr., the other 'redacted legislators,' and we do not know whom else,

Nonetheless, our adherence to the holding of *Pascoe* today should in no way be read to cast aspersions on Solicitor Pascoe's diligence or professionalism. While Solicitor Pascoe was incorrect about the extent of the authority granted to him, we find no evidence he acted in bad faith. We commend Solicitor Pascoe for his service.

## B.

### *Subject matter jurisdiction existed.*

We turn next to Appellant's contention that Solicitor Pascoe's overreach of authority somehow deprived the State Grand Jury or the circuit court of subject matter jurisdiction. While the authority or jurisdiction of Solicitor Pascoe is properly called into question, we reject the argument that the State Grand Jury or circuit court lacked subject matter jurisdiction.

"Subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong." *Ex parte Harrell*, 409 S.C. 60, 70, 760 S.E.2d 808, 813 (2014) (per curiam) (citation omitted). "South Carolina circuit courts are vested with original jurisdiction in civil and criminal cases, except those cases in which exclusive jurisdiction shall be given to inferior courts . . . ." *Id.* (citation omitted); *see also* S.C. Const. art. V, § 11. Thus, "[c]ircuit courts obviously have subject matter jurisdiction to try criminal matters." *State v. Gentry*, 363 S.C. 93, 101, 610 S.E.2d 494, 499 (2005). There is no question that the circuit court here had "the power to hear and determine cases of the general class to which the proceedings in question belong." *See Harrell*, 409

---

is no longer subject to any supervision. The Attorney General has been removed from his constitutional role, and the First Circuit voters—who elected Pascoe as Solicitor—are not likely to be concerned with actions he takes outside the circuit with money he did not get from taxes they paid. As an unsupervised prosecutor, free from any oversight or control by the Attorney General or the First Circuit voters, Pascoe has created a 'prosecutive' mess. On one hand, by his own description, Pascoe allowed the most corrupt politician in Columbia (Quinn [Jr.]) and the most corrupt entity in politics (Richard Quinn & Associates) to go essentially scot free. On the other hand, Pascoe accepted hundreds of thousands of dollars from major South Carolina corporations on the promise not to prosecute them for conduct the State Grand Jury found probable cause to believe is criminal. These and other concerns demonstrate the risks and dangers article V, section 24 was designed to protect against.").

S.C. at 70, 760 S.E.2d at 813; *Gentry*, 363 S.C. at 101, 610 S.E.2d at 499. Solicitor Pascoe's authority or lack thereof has no bearing on the circuit court's power to hear a criminal case. *See Gentry*, 363 S.C. at 100, 610 S.E.2d at 498 ("[A] defective indictment does not affect the jurisdiction of the trial court to determine the case presented by the indictment.").

Likewise, while the State Grand Jury's authority extends throughout the State, its jurisdiction is limited to certain offenses enumerated in section 14-7-1630. S.C. Code Ann. § 14-7-1630(A) (Supp. 2019); *State v. Wilson*, 315 S.C. 289, 291, 433 S.E.2d 864, 866 (1993). As is relevant to this case, the subject matter jurisdiction of the State Grand Jury includes:

> [(1)] a crime, statutory, common law or other, *involving* public corruption as defined in Section 14-7-1615[; (2)] a crime, statutory, common law or other, *arising out of or in connection with* a crime involving public corruption as defined in Section 14-7-1615[; (3)] and *any attempt, aiding, abetting, solicitation, or conspiracy* to commit a crime, statutory, common law or other, involving public corruption as defined in Section 14-7-1615.

S.C. Code Ann. § 14-7-1630(A)(3) (emphasis added).[18] Here, aside from Solicitor Pascoe's lack of authority, there can be no contention that Appellant's alleged

---

[18] Section 14-7-1615(B) provides a similarly broad definition of public corruption:

> The term "public corruption" means *any unlawful activity*, under color of or in connection with any public office or employment, of:
>
> > (1) any public official, public member, or public employee, or the agent, servant, assignee, consultant, contractor, vendor, designee, appointee, representative, or any other person of like relationship, by whatever designation known, of any public official, public member, or public employee under color of or in connection with any public office or employment; or
> >
> > (2) any candidate for public office or the agent, servant, assignee, consultant, contractor, vendor, designee, appointee, representative of, or any other person of like relationship, by whatever name known, of any candidate for public office.

S.C. Code Ann. § 14-7-1615(B) (2017) (emphasis added).

crimes do not "involve" or otherwise "arise out of or in connection with" allegations of public corruption, as broadly defined by the General Assembly. As a result, the State Grand Jury had subject matter jurisdiction, regardless of Solicitor Pascoe's lack of authority to pursue the investigation beyond Merrill and Quinn Jr. *See State v. Sheppard*, 391 S.C. 415, 423, 706 S.E.2d 16, 20 (2011) ("While the statute establishing the jurisdiction of the state grand jury plainly evidences the General Assembly's intent to limit said jurisdiction, we do not believe it intended to hinder the grand jury's ability to investigate and indict for crimes committed in the course of conduct of an enumerated crime. . . . We find the language 'or a crime related to' is broad enough to encompass those crimes committed in the same course of conduct as an enumerated crime. Thus, the state grand jury has jurisdiction . . . .").[19]

## C.

### *Solicitor Pascoe's authority extended to the perjury charge.*

Having rejected Appellant's argument that Solicitor Pascoe's lack of authority implicated subject matter jurisdiction, we turn now to his fundamental premise that the indictments against him were nonetheless a "nullity." We reject this contention

---

[19] Appellant's subject matter jurisdiction challenge is unavailing. However, the dissent makes a valid observation concerning other cases pursued by Solicitor Pascoe, including that of former state Senator John Courson. Courson pled guilty. A free and voluntary guilty plea waives all nonjurisdictional defects and defenses. *State v. Rice*, 401 S.C. 330, 331–32, 737 S.E.2d 485, 485–86 (2013) ("[I]n South Carolina, a guilty plea constitutes a waiver of nonjurisdictional defects and claims of violations of constitutional rights. . . . 'When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the plea.'" (internal alteration marks omitted) (quoting *Tollett v. Henderson*, 411 U.S. 258, 267 (1973))). Perhaps Attorney General Wilson should have intervened at the first instance Solicitor Pascoe ventured beyond his limited authority. Regardless, as soon as the issue was formally raised by one of the affected defendants, the Attorney General promptly made his position known. In any event, the failure of Attorney General Wilson to intervene in other matters is no reason to interpret *Pascoe* contrary to its clear language.

as it relates to the perjury indictment, as that arose squarely within the scope of authority bestowed on Solicitor Pascoe by Attorney General Wilson and this Court.

South Carolina's perjury statute is directed not so much at the effects of the perjurious statement, but rather at its perpetration and the "probable wrong done the administration of justice by false testimony." *See United States v. Williams*, 341 U.S. 58, 68 (1951); *see also State v. Byrd*, 28 S.C. 18, 21–22, 4 S.E. 793, 795 (1888) (noting the enactment of the predecessor to the modern perjury statute essentially eliminated the common-law requirement that the defendant's testimony be material to an issue in the proceeding). Thus, a grand jury lawfully assembled has the authority to indict for perjury committed by a non-target of the investigation, regardless of the scope of the grand jury's authority. *See Williams*, 341 U.S. at 68–69 ("[The federal perjury] statute[, which, like South Carolina's perjury statute, is focused on perpetration and not the materiality of the untruthful statements,] *has led federal courts to uphold charges of perjury despite arguments that the federal court at the trial affected by the perjury could not confer a valid judgment due to lack of diversity jurisdiction, or due to the unconstitutionality of the statute out of which the perjury proceedings arose*. Where a federal court has power, as here, to proceed to a determination on the merits, that is jurisdiction of the proceedings. The District Court has such jurisdiction. Though the trial court or an appellate court may conclude that the statute is wholly unconstitutional, or that the facts stated in the indictment do not constitute a crime or are not proven, *it has proceeded with jurisdiction and false testimony before it under oath is perjury*." (emphasis added) (internal footnotes omitted)); *United States v. Caron*, 551 F. Supp. 662, 665–67 (E.D. Va. 1982); *People v. Skibinski*, 389 N.Y.S.2d 693, 695 (App. Div. 1976) ("Although defendant [m]ay have successfully contested an [i]ndictment returned against him by the [illegally constituted grand jury], *the alleged illegal composition of that body in no manner affected its right lawfully to administer an oath to him or receive testimony from him* nor did its actions in any manner prejudice defendant nor deprive him of his constitutional rights." (emphasis in original omitted, new emphasis added) (internal citation omitted)).

Here, Solicitor Pascoe had the authority to investigate Quinn Jr., and it is unquestionable that he took all of the appropriate steps in initiating the State Grand Jury for that purpose. *See Pascoe*, 416 S.C. at 647, 788 S.E.2d at 696. Likewise, it is undisputed Solicitor Pascoe had the authority to subpoena documents and witnesses related to Quinn Jr. and RQA's alleged criminal activities. As Appellant conceded during oral arguments, Solicitor Pascoe had the authority to call Appellant to testify about his dealings with RQA before the State Grand Jury.

Appellant had firsthand information concerning the investigation into Quinn Jr. and RQA—he had been paid hundreds of thousands of dollars by RQA, so the nature of the relationship between Appellant and RQA was relevant to the investigation. *See* S.C. Code Ann. § 2-17-110(G) ("A lobbyist, a lobbyist's principal, or a person acting on behalf of a lobbyist or a lobbyist's principal may not employ on retainer a public official, a public employee, . . . or a firm or organization in which the public official or public employee has an economic interest.").

Irrespective of the fact that Solicitor Pascoe eventually went beyond the investigation of Quinn Jr. and RQA to indict Appellant for misconduct in office and conspiracy, at the time Appellant testified before the State Grand Jury, the grand jury "was in the process of administering justice, a constituent part of which was the administering of an oath to" Appellant. *Caron*, 551 F. Supp. at 666. The fact that Solicitor Pascoe exceeded his authority at a later date does not negate the oath or the falseness of Appellant's testimony. *See id.* It would be specious to argue the taint of Solicitor Pascoe's lack of authority somehow voided Appellant's testimony before the State Grand Jury, particularly because the subject of Appellant's testimony was squarely within the authority granted to the solicitor. *See id.*; *cf. Williams*, 341 U.S. at 68–69. While *Williams* is not binding on this Court, we find its reasoning, as well as that in *Caron*, persuasive.

Accordingly, given that Appellant's assignments of error do not implicate subject matter jurisdiction, his perjury indictment is not a "nullity." We therefore affirm his perjury conviction and sentence as properly falling within the scope of Solicitor Pascoe's authority.[20]

## D.

### *Appellant's misconduct in office charges were not within the limited grant of authority to Solicitor Pascoe.*

While we conclude Appellant's perjury indictment fell within the scope of Solicitor

---

[20] Appellant also contends the circuit court erred in failing to grant his motion for a directed verdict as to the perjury indictment. We affirm pursuant to Rule 220(b), SCACR, as—when the evidence is viewed in the light most favorable to the State—there was a wealth of evidence that reasonably tended to prove Appellant's testimony related to the nature and scope of his employment with RQA was patently false.

Pascoe's borrowed authority, we cannot reach the same conclusion as to the misconduct in office charges. The narrow, unmistakable holding of this Court's decision in *Pascoe* is that Attorney General Wilson recused himself and his office for purposes of the "redacted legislators" only, but did not recuse himself as to "any other matters," including alleged criminal misdeeds by other members of the General Assembly. Given the magnitude of the Attorney General's constitutional responsibilities as the State's chief prosecutor, we cannot justify Solicitor Pascoe's broad assumption of authority for a wide-sweeping "statehouse corruption probe" absent more explicit permission from Attorney General Wilson or the Attorney General's Office.

Appellant's argument that Solicitor Pascoe's lack of authority caused the State Grand Jury proceedings and prosecution to be a nullity is a novel argument. For the reasons stated above, we reject the "nullity" argument insofar as Appellant challenges subject matter jurisdiction. We must differentiate between the power of a court to hear a case and the authority of a prosecutor. To be sure, the State Grand Jury and circuit court have jurisdiction to hear matters involving allegations of public corruption. There can be no "nullity" in a subject matter jurisdiction sense. The presence of subject matter jurisdiction, however, is an entirely different matter from a challenge to a special prosecutor's authority. It is this latter challenge that Appellant makes. We find the case of *People v. Di Falco* instructive. *See* 377 N.E.2d 732 (N.Y. 1978) (per curiam). While *Di Falco* is not perfectly on point, its reasoning is persuasive and informs our analysis.

In *Di Falco*, a "special state prosecutor" obtained an indictment against the defendant. *Id.* at 281. Because of the nature of the proceedings, the defendant moved to dismiss the indictment "on the ground that the Grand Jury proceedings were defective since the Special Prosecutor was a person unauthorized to be in its presence." *Id.* Holding the special prosecutor "was not a proper person before this Grand Jury, [the lower court] dismissed the indictment and transferred the matter to [the proper prosecutor] with leave to apply for permission to submit the charges to another Grand Jury." *Id.* The dismissal of the original indictment was affirmed on appeal. *Id.*

The Court of Appeals of New York examined the special prosecutor's lack of authority vis-à-vis the issue of prejudice to the defendant. *Id.* at 281–82. In particular, the *Di Falco* court analyzed the "crucial nature of the prosecutor's role" before a grand jury. *Id.* As with South Carolina's Attorney General, a New York District Attorney possesses virtually unlimited authority before a grand jury in terms of what evidence will be presented, what evidence will not be presented, and what charges will (and will not be) presented. *Id.* at 282. Given this unchecked

and broad discretionary authority, the court concluded the law "mandates a finding that prejudice to the defendant is likely to result from the presence of an unauthorized prosecutor before the Grand Jury." *Id.* at 281.

The court in *Di Falco* noted that as a result of "the breadth and importance of the duties placed upon the District Attorney in Grand Jury proceedings, it is no small matter when another acts in this capacity." *Id.* at 282. We agree. Here, Solicitor Pascoe was granted limited, defined authority. Solicitor Pascoe exceeded that authority, albeit in good faith. We conclude that to the extent Solicitor Pascoe acted beyond his authority *before the State Grand Jury*, the unauthorized action presents a structural error.

Having said that, the dissent correctly notes that New York courts do not apply the *DiFalco* rule in an overly broad fashion, with the critical inquiry being the scope of the prosecutor's authority. *See, e.g.*, *People v. Garcia*, 838 N.Y.S.2d 854, 855–56 (Sup. Ct. 2007) (discussing *DiFalco* and explaining that the special state prosecutor there "was not authorized to be present in the grand jury" because "he lacked jurisdiction to prosecute the matter covered by the indictment because his grant of authority [was] limited" to certain enumerated situations; but distinguishing that situation from one in which "the assistant district attorney in charge of the special narcotics parts has jurisdiction over narcotics cases arising in any of the five boroughs and non-narcotics offenses in the county in which the special narcotics grand jury was situated" (citation omitted)). We likewise do not intend for our holding today to be read broadly, for it is heavily fact-dependent.

As emphasized by the *DiFalco* court, in a grand jury setting, the prosecutor sets forth his case without interference or opposition—a decided lack of checks and balances on the power of the State during this early stage of a criminal inquiry. Grand jury proceedings have been described as being sufficiently non-adversarial that, if the prosecutor asks, the grand jury will indict a ham sandwich. This tongue-in-cheek characterization has stood the test of time for a reason. The prosecutor alone calls the shots concerning every aspect of the grand jury proceedings. A judge may become involved but generally only when requested *by the prosecutor*.

The trial is fundamentally different. At trial, a judge presides; the defendant is present; the defendant is represented by counsel who may challenge the evidence of the State and, along with the oversight of the trial judge, ensure the rights of the accused are protected. It is for these reasons the law generally recognizes *trial* errors are subject to a prejudice or harmless error analysis.

Appellant made his motion to dismiss the indictments early in the process based on Solicitor Pascoe's lack of authority to appear in front of the State Grand Jury. While the dissent sees no limitations on Solicitor Pascoe's authority to act as the public corruption czar in South Carolina, the plain and unmistakable language in *Pascoe* compels a contrary conclusion. Moreover, the South Carolina Constitution's grant of power and responsibility to the Attorney General demands that this Court proceed cautiously in delegating the power of the Attorney General to a special prosecutor. Even the limited authority granted to Solicitor Pascoe in *Pascoe* was "no small matter." *See DiFalco*, 377 N.E.2d at 282. We have recognized that limited authority by affirming the perjury conviction, for the perjury charge arose in the context of testimony during the proper exercise of Solicitor Pascoe's grant of authority.

The positions of the dissent and the concurrence are straightforward. The dissent makes Appellant's almost-certain guilt the center piece of its analysis—the "ends justify the means" approach. On the other hand, the concurrence seizes upon Solicitor Pascoe's clear lack of authority and would reverse all convictions. Our view is much closer to the concurrence. But for the perjury charge arising within Solicitor Pascoe's limited authority, with Appellant's concession that the solicitor had the authority to subpoena Appellant before the State Grand Jury, we would join the concurrence.

Beyond the perjury charge and conviction, Solicitor Pascoe's lack of authority presents a structural error. The dissent's lack-of-prejudice argument is nothing more than believing the ends justify the means, which we respectfully reject. We therefore vacate Appellant's misconduct in office indictments, as they remain—in the first instance—wholly within Attorney General Wilson's power to authorize and pursue, or alternatively appoint a prosecutor to act in his stead.

On remand, Attorney General Wilson shall inform the presiding judge of the State Grand Jury in open court or in a public filing of his decision as to whether he will make the prosecutive decision on whether to pursue the vacated charges against Appellant for statutory and common law misconduct in office. If the Attorney General recuses himself concerning Appellant, the Attorney General shall appoint

a circuit solicitor to act in his stead for the limited purpose of prosecuting Appellant.[21]  *See* S.C. Code Ann. § 14-7-1650 (2017).[22]

[21] We view the involvement of the Attorney General on remand as constitutionally essential.  The record of the proceedings does not inform the Court of the reason Attorney General Wilson stepped aside from the investigation of Quinn Jr.  When the matter was initially before the Court, even Solicitor Pascoe informed this Court that "the nature of the Attorney General's conflict here is not known."  The dissent assumes Attorney General Wilson would be disqualified from investigating and prosecuting other legislators.  This may well be true, but the record does not answer a hypothetical recusal question.  Moreover, there is nothing before this Court to suggest Attorney General Wilson would not follow the rules of professional conduct concerning recusal.  That is precisely how Solicitor Pascoe came to be appointed as special prosecutor in the Harrell matter.  The dissent observes that "[r]ecusal is not a moving target."  We completely agree, and yet that is precisely the result advocated by the dissent.

[22] On a related note, during the course of his "statehouse corruption probe," Solicitor Pascoe entered into so-called corporate integrity agreements with five lobbyist's principals that were clients of RQA—SCANA, Palmetto Health, AT&T, the University of South Carolina, and the South Carolina Association for Justice.  Under these agreements, the five corporations paid the First Circuit Solicitor's Office over $350,000 in exchange for Solicitor Pascoe's agreement not to prosecute them for their collective failure to disclose RQA as a lobbyist.  *See* S.C. Code Ann. § 2-17-25(A) (2005) ("Any lobbyist's principal must, within fifteen days of employing, appointing, or retaining a lobbyist, register with the State Ethics Commission as provided in this section."); *id.* § 2-17-130(A) (2005) ("A lobbyist or a lobbyist's principal who [willfully] violates the provisions of this chapter is guilty of a misdemeanor and, upon conviction, must be fined not more than two thousand five hundred dollars or imprisoned for not more than one year, or both.").  According to Solicitor Pascoe, at the time he entered into the corporate integrity agreements, the State Grand Jury had already determined that probable cause existed to believe that each of the five corporations had violated section 2-17-25(A).  We are troubled by these agreements, which have no precedent in South Carolina law.  To be sure, we are not persuaded by Solicitor Pascoe's claim of "unfettered prosecutorial discretion" to enter into these types of agreements.

The question of the legality and ethics of these agreements first arose during oral arguments in Quinn Jr.'s case, but due to the interruption in court operations caused by the coronavirus pandemic, we withheld judgment on the matter until it could be

## IV.

We do not reach our decision today lightly, for we recognize the critical societal importance of zealously prosecuting public corruption. Yet, as judges, our allegiance must be to the rule of law, not a particular outcome. The law is designed to find the truth within rules that serve to guarantee the certainty of a fair process. The law anticipates that the two goals—ascertainment of the truth and certainty of a fair process—may collide, and when they do, the certainty of a fair process must prevail. In short, in the law, the ends do not justify the means. While the law provides for an affirmation of Appellant's perjury conviction here, it also mandates that the misconduct in office convictions be set aside and remanded for further proceedings involving the appropriate prosecutorial authority. In this case, the person with clear legal authority to prosecute Appellant was not Solicitor Pascoe, but instead either Attorney General Wilson or a designee of his choosing. The importance of the constitutional role of the Attorney General to our criminal justice system cannot be overstated, and we must respect the importance of the Attorney General's Office, particularly as it relates to the State Grand Jury. Accordingly, we affirm Appellant's perjury conviction and sentence, vacate his misconduct in office convictions, and remand for further proceedings consistent with this opinion.[23]

---

more fully briefed in this case. *See Quinn*, 430 S.C. at 122–23, 843 S.E.2d at 359. While Attorney General Wilson has made clear his position on the illegality of these corporate integrity agreements, none of the five corporate entities has appeared here via filing or otherwise. Because the issue of the corporate integrity agreements is not technically before the Court, we decline to rule on the matter. However, further details related to the corporate integrity agreements may be found in the public record of the State Grand Jury Report. *See* David M. Pascoe, *News Release (October 9, 2018): Solicitor David Pascoe's Statement Concerning the Release of the State Grand Jury Report*, First Jud. Cir. Solicitor's Office (Oct. 9, 2018), http://scsolicitor1.org/wp-content/uploads/2018/10/28th-Grand-Jury-Report.pdf. On remand, regardless of Attorney General Wilson's decision to further prosecute Appellant, the presiding judge of the State Grand Jury shall require an accounting of the funds, which reportedly remain in an escrow account. The judge shall direct that the funds be transferred to the proper account as provided by law.

[23] Because the prior issues are dispositive, we do not address Appellant's double jeopardy challenge or the failure to dismiss the indictment for statutory misconduct in office. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613,

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**FEW, J., concurs. HEARN, J., concurring in part and dissenting in part in a separate opinion in which BEATTY, C.J., concurs. JAMES, J., concurring in part and dissenting in part in a separate opinion.**

---

518 S.E.2d 591, 598 (1999).

**JUSTICE HEARN**: I concur with the majority's decision to affirm James Harrison's conviction for perjury but disagree with respect to the two convictions for public corruption. I would hold that Solicitor David Pascoe acted within his authority in pursuing public corruption charges against Harrison because those charges were directly linked to the business Richard Quinn & Associates ("RQ&A"), which was completely within Pascoe's authority to investigate. Accordingly, I do not share the majority's view that *Pascoe v. Wilson*, 416 S.C. 628, 788 S.E.2d 686 (2016) limited Pascoe's authority to investigate and prosecute the two redacted legislators. I also disagree with the majority's decision to reverse the misconduct in office convictions absent any demonstration that Pascoe's capacity to prosecute Harrison tainted the proceedings or otherwise had any bearing on the validity of the trial. At every juncture, Harrison was afforded all his constitutional protections, receiving ample due process through his lengthy trial. Accordingly, I respectfully dissent and would affirm all three convictions.

## I.     *Pascoe's Scope of Authority*

I believe the majority is mistaken in its reading of the lead opinion in *Pascoe v. Wilson* as expressly limiting the authority of Pascoe to prosecute only Rick Quinn and James Merrill. While it is true that we referred to the investigation as the "redacted legislators matter," the use of that phrase was simply a description of the investigation *at that time.* It is important to note that the focus of this investigation into public corruption has shifted several times since its inception. Initially, the investigation by SLED began with an examination of an ethics complaint received by the Attorney General's Office against former Speaker of the House, Robert Harrell. In December 2013, SLED issued an "Investigative Report" concerning "Public Corruption/Official Misconduct" relating to Harrell. At that time, the investigation might well have been called "the Harrell investigation." This investigative report was approximately forty pages in length, not including numerous attachments, and eight of the pages were heavily redacted. A month after SLED issued this report, the Chief of SLED and the Attorney General petitioned to impanel a state grand jury, which the presiding judge granted. Shortly thereafter, Harrell filed a motion to disqualify the Attorney General, and, during a hearing on this motion, questions regarding the grand jury's jurisdiction arose. The presiding judge held the grand jury did not have jurisdiction, but this Court disagreed and remanded for the court to consider the merits of the Attorney General's disqualification. *Ex parte Harrell*, 409 S.C. 60, 69–72, 760 S.E.2d 808, 812–14 (2014), *abrogated on other grounds by Pascoe v. Parks*, 415 S.C. 643, 785 S.E.2d 360 (2016). However, before the presiding judge could do so, the Attorney General designated Pascoe as having full authority to investigate and prosecute Harrell.

*Pascoe*, 416 S.C. at 631, 788 S.E.2d at 688. Pascoe did just that, as Harrell pled guilty in October 2014 and resigned from office. *Id.* at 631 n.3, 788 S.E.2d at 688 n.3.

As prosecutor, Pascoe then rightly turned his attention to the allegations of criminal activity involving the redacted legislators included in the Investigative Report, and the investigation thus expanded from the Harrell investigation into the redacted legislators' investigation. Shortly thereafter, Attorney General Wilson firewalled himself from all aspects of the investigation due to possible "inherent conflicts" between Wilson and members of the State House—the redacted legislators. *Id.* at 631–32, 788 S.E.2d at 688. Officials at the Attorney General's Office corresponded with Pascoe multiple times in 2015 and 2016 concerning the redacted portions of the Investigative Report.[24] *Id.* at 632–37, 788 S.E.2d at 688–91.

In March of 2016, Pascoe sought to initiate a state grand jury investigation into the two redacted legislators, including their respective businesses, because those entities were also mentioned in the redacted portion of the Investigative Report. Thus, although Pascoe initially focused on the two sitting House members who were expressly named in the report, he later investigated RQ&A, and, in doing so, discovered that Harrison was its former Chief Operating Officer. Just as the original investigation into Harrell had led Pascoe to the redacted legislators and their businesses, that investigation also led him to Harrison. When this Court heard *Pascoe v. Wilson* in 2016, we were unaware of any involvement by Harrison, and we therefore referred to the investigation as what we then knew it to be—an investigation into the two redacted legislators. Therefore, in my view, our use of that phrase, rather than a limitation on Pascoe's authority, was nothing more than our manner of describing the matter before us, and the majority reads far more into that phrase than I believe was intended. In fact, that phrase—to which the majority ascribes so much weight—is not itself entirely accurate, because the investigation

[24] I disagree with the majority that the communications by Deputy Attorney General John McIntosh and Assistant Deputy Attorney General Creighton Waters limited the extent of Pascoe's authority. To begin, these communications occurred nearly nine months after the Attorney General recused himself, and I would not find any subsequent attempt to narrow that recusal dispositive. Regardless, because Harrison's indictment directly flowed from the investigation into Rick Quinn, James Merrill, and their respective businesses—all undisputedly contained in the redacted portion of the Investigative Report—Harrison's prosecution was inextricably intertwined with the previous investigations.

was not only into the redacted legislators as individuals, but also included their two respective businesses. Under the majority's strict interpretation of the phrase "redacted legislators," RQ&A and Representative Merrill's business entity were outside the parameters of Pascoe's authority to investigate.

Following *Pascoe v. Wilson*, the grand jury subpoenaed bank records concerning RQ&A. Investigators received vast amounts of canceled checks and bank statements, which revealed numerous suspicious payments suggesting Rick Quinn and RQ&A were complicit in far more public corruption and financial crimes than anticipated in SLED's original Investigative Report. For example, investigators discovered a money laundering scheme by Senator John Courson's campaign, which culminated in the former senator pleading guilty to common law misconduct in office for converting campaign monies into personal funds.[25] Investigators also discovered RQ&A received significant retainer income from numerous lobbyists' principals. This fact, combined with the revelation of regular payments to legislators—including Harrison—gave rise to a strong suspicion of possible crimes under the State Ethics Act and merited further investigation.

In March 2017, Pascoe notified the presiding judge, Knox McMahon, that the state grand jury's area of inquiry was being expanded to include other legislators and entities pursuant to section 14-7-1690 of the State Grand Jury Act. S.C. Code Ann. § 14-7-1690 (2017) ("Once a state grand jury has entered into a term, the Attorney General or solicitor, in the appropriate case, may notify the presiding judge in writing as often as is necessary and appropriate that the state grand jury's areas of inquiry have been expanded or additional areas of inquiry have been added thereto."). At the same time, the state grand jury subpoenaed Harrison to appear, and there can be no question that body was authorized to issue the subpoena, as its authority was established pursuant to *Pascoe v. Wilson*. At the time of Harrison's testimony before the grand jury, investigators did not know the full extent of his relationship with RQ&A. Instead, they knew merely that Harrison had received consistent payments from the business from 2010 to 2012. However, Harrison testified that he only worked for RQ&A on campaigns. This contention was suspect, given substantial evidence demonstrating that from 2000 to 2012, Harrison had received more than $800,000 but was seldom seen by other employees in RQ&A's office. Moreover, his testimony that he was primarily involved in campaigns for RQ&A's clients is contradicted by his own letter to the House Ethics Commission in 1999 wherein he stated,

---

[25] Senator Courson's guilty plea has not been challenged before this Court.

> I have recently accepted the position of Partner and Chief Operating Officer with Richard Quinn & Associates (RQ&A), a Columbia consulting and public relations firm. . . . As Chief Operating Officer (a salaried position), my responsibilities would include managing the day-to-day operations of the firm, as well as providing public relations/corporate communications services for its clients.

I disagree that upon discovering Harrison's apparent public corruption, Pascoe was required to return to the same entity that had recused itself because of potential conflicts of interest with the two redacted legislators. If the Attorney General was disqualified from pursuing Rick Quinn and James Merrill, as well as their business entities, he was surely disqualified from investigating legislators who were receiving phantom and unreported "salaries" from RQ&A. It is inescapable that there was a direct nexus between Rick Quinn, RQ&A, and Harrison, and I would hold that given the disqualification of the Attorney General, Pascoe's authority to act in his stead continued.

The majority also contends the Attorney General's authority must be steadfastly protected because he is the state's chief prosecutor, and in doing so, relies primarily on the dissent in *Pascoe v. Wilson*. *See* S.C. Const. art. V, § 24 ("The Attorney General shall be the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record."). While I fully support the general goal of ensuring that the Attorney General is able to fulfill his constitutional duties, article V, section 24 of our constitution should not be interpreted to permit the Attorney General to oversee an investigation in which he has previously recused himself. Recusal is not a moving target. Simply put, the Attorney General and his office were recused from any matter relating to the two redacted legislators, and just as RQ&A was connected to them, so was Harrison.[26]

We expressly held in *Pascoe v. Wilson* that the correspondence from the Attorney General's Office to both Pascoe and Chief Keel stated "without reservation that the Attorney General's *Office*" was recused from the investigation, and that Pascoe was acting as the Attorney General "fully vested with the authority of the

---

[26] I have nothing but the highest respect and personal regard for our Attorney General and believe he conducted himself honorably throughout this investigation. My focus on the scope of his recusal should not be read to imply any wrongdoing on his part or that of his office.

South Carolina Constitution Article V, Section 24." *Id.* at 642 n.15, 788 S.E.2d at 694 n.15. Moreover, the absence of any challenge by the Attorney General that Pascoe had exceeded his authority when the State Grand Jury indicted John Courson, Richard Quinn, Tracy Edge, or James Harrison speaks volumes. Surely, if the Attorney General believed Pascoe was acting outside the scope of his authority set forth in *Pascoe v. Wilson*, he would have challenged those indictments as he had done previously in that case. To this day, the Attorney General has not challenged Pascoe's authority to indict these other former legislators whose criminal conduct came to light through Pascoe's investigation of the redacted legislators and their businesses. His silence on a matter which he previously did not hesitate to raise before this Court undermines the majority's hubris that *Pascoe v. Wilson* "speaks for itself, leading to only one conclusion." Indeed, two of the four members of the Court who previously joined in that decision unequivocally reject that position today.

Ultimately, just as the initial Harrell investigation broadened into an investigation involving the redacted legislators and their businesses, that investigation then led Pascoe to investigate Harrison. Therefore, I would hold, consistent with our prior opinion, that Pascoe continued to be fully vested with the authority of the Attorney General in accordance with the South Carolina Constitution.

II.     *The Majority's Remedy*

I concur with the majority's position that the question of Pascoe's authority does not affect either the state grand jury's or the circuit court's subject matter jurisdiction. As the majority notes, there can be no dispute the state grand jury was legally established and that it had jurisdiction to pursue allegations of public corruption. Further, Pascoe notified the presiding judge that the grand jury's inquiry had expanded in accordance with state law. *See* S.C. Code Ann. § 14-7-1690 (2017) (noting that the "Attorney General or solicitor" may notify the presiding judge when the state grand jury is expanding the scope of its inquiry). Moreover, the entire process received the imprimatur of the state grand jury when the presiding judge authorized the issuance of the indictments.

However, I disagree that Pascoe's purported lack of authority leads to only one result—reversing Harrison's convictions. The penultimate question before us is who was permitted to prosecute the case against Harrison. On this issue, Harrison essentially argues that he was entitled to a different representative of the State. A criminal defendant does not have the right to choose his own prosecutor. *See State v. Mantooth*, 788 S.E.2d 584, 586 (Ga. Ct. App. 2016) ("[W]e are aware of no other

jurisdiction that permits a criminal defendant to choose his or her prosecutor."). This is consistent with the fact that a defendant has no right to choose other aspects of a trial. *See Sinito v. United States,* 750 F.2d 512, 515 (6th Cir. 1984) (noting a criminal defendant has no right to have a case heard by any particular judge); *Levine v. United States,* 182 F.2d 556, 559 (8th Cir.1950) ("Litigants have no vested right in the order in which cases are assigned for trial."). I believe the proper analysis must focus on how Harrison was prejudiced by the fact that Pascoe prosecuted the case against him rather than any other lawyer on behalf of the State. *See State v. Thrift,* 312 S.C. 282, 303–04, 440 S.E.2d 341, 353 (1994) (citing *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256 (1988) ("[T]he dismissal of an indictment for non-constitutional error [is] only appropriate if it [is] established that the violation substantially influenced the grand jury's decision to indict, or there is grave doubt that the decision to indict was free from substantial influence of such violations."). Harrison never attempts to make this showing; nor could he, as he was afforded all the process to which he was entitled through a jury trial and subsequent appeal. *United States v. Hasting,* 461 U.S. 499, 508–09 (1983) (noting there are a "myriad [of] safeguards provided to assure a fair trial" while also acknowledging "there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial"). Thus, I would uphold the validity of all three indictments.

Even with the overlay of article V, section 24, most errors are not treated as structural, and I disagree with the majority's contention that the question of Pascoe's authority falls within the limited number of cases requiring this Court to automatically reverse Harrison's convictions.[27] *Arizona v. Fulminante,* 499 U.S.

---

[27] The majority relies on a case from New York to support its structural error conclusion. *See People v. Di Falco,* 377 N.E.2d 732 (N.Y. 1978). However, New York does not equate all cases involving a prosecutor's authority as a structural error. For example, in *People v. Carter,* New York's highest court upheld various drug convictions after the parties discovered the prosecutor was an unlicensed attorney who had been masquerading as a lawyer for many years. 566 N.E.2d 119, 123 (1990). Neither the district attorney's office, the court, nor the defense attorneys was aware of this fact, but after learning this information following trial, the defendants asserted their due process rights had been violated. *Id.* at 123. Since there was no question of jurisdiction, the court determined the error was not structural; therefore, the focus turned to whether the defendants were able to demonstrate prejudice. *Id.* at 124 ("[I]n the absence of prejudice, the fact that [the prosecutor] was not a lawyer did not result in a deprivation of defendants' constitutional due process rights."); *see also People v. Munoz,* 550 N.Y.S.2d 691 (1990) (involving the same prosecutor as

279, 309 (1991) (defining structural errors as "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards"). *State v. Rivera*, 402 S.C. 225, 246, 741 S.E.2d 694, 705 (2013) ("Most trial errors, even those which violate a defendant's constitutional rights, are subject to harmless-error analysis."). Instead, a criminal defendant must demonstrate prejudice to warrant a reversal. *In re Gonzalez*, 409 S.C. 621, 636, 763 S.E.2d 210, 217 (2014) ("A fundamental principle of appellate procedure is that a challenged decision must be both erroneous and prejudicial to warrant reversal."). For example, we have upheld a conviction where the defendant alleged his due process rights were violated by a solicitor who had the authority to select the judge. *State v. Langford*, 400 S.C. 421, 440, 735 S.E.2d 471, 481 (2012). While we found that permitting solicitors to control the criminal docket was unconstitutional, we nevertheless examined whether the defendant suffered any prejudice. *Id.* at 439–40, 735 S.E.2d at 480–81. Even with the grave potential for abuse that could arise by permitting the State to select the judge, we examined the record before us and found the defendant failed to establish prejudice. *Id.*

Another example is evident in the speedy trial context. In *Hunsberger*, we reversed a murder conviction after the State was responsible for the majority of a ten-year delay between the dates of the indictment and when the State called the case for trial. *State v. Hunsberger*, 418 S.C. 335, 352, 794 S.E.2d 368, 377 (2016). Importantly, in analyzing whether the State violated the defendant's constitutional rights, we examined whether the defendant suffered prejudice from the lengthy delay. *Id.* at 350–52, 794 S.E.2d at 375–77. The Court found the defendant demonstrated prejudice, and therefore reversed his conviction. *Id.* at 352, 794 S.E.2d at 377. Conversely, in instances where a defendant failed to demonstrate prejudice, our courts have found no constitutional violation and thus, upheld the convictions. *State v. Brazell*, 325 S.C. 65, 76, 480 S.E.2d 64, 70–71 (1997) (upholding convictions for armed robbery and murder after finding the defendant failed to demonstrate prejudice from the State's delay in indicting him and in its delay in prosecuting him); *State v. Allen*, 269 S.C. 233, 239, 237 S.E.2d 64, 67 (1977) (affirming burglary convictions due in part because the defendants failed to establish prejudice from the delay in setting the case for trial). *See also State v. Baccus*, 367

---

in *Carter*, where the court noted, "any prejudice stemming from [the prosecutor's] lack of admission would impact upon the People, rather than defendants"). While I would not necessarily agree with this resolution, I cite it to demonstrate that even situations far more egregious than the one presented here are still subject to a harmless error analysis.

S.C. 41, 55, 625 S.E.2d 216, 223 (2006) (holding although the trial court erred in admitting evidence obtained in violation of the defendant's Fourth Amendment rights, the error was harmless); *id.* ("When guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside a conviction for insubstantial errors not affecting the result.").

I believe the same analysis unquestionably demonstrates that Harrison cannot establish prejudice. There can be no credible contention that the grand jury based its decision to indict on the fact that Pascoe was the prosecutor. Instead, the grand jury was tasked to determine whether "probable cause exist[ed] for the indictment." S.C. Code Ann. § 14-7-1750 (2017). In no way was the identity of the State's attorney relevant in this process; rather, the extensive amount of evidence against Harrison certainly drove the grand jury's decision to indict. There also can be no doubt that the jury convicted Harrison as a result of all the evidence presented rather than the name of the prosecutor. Accordingly, I do not believe Pascoe's authority had any effect on the validity of the indictments or on the outcome of his criminal trial, and thus, I would uphold all three convictions.

## III. Conclusion

Ultimately, Pascoe did what any prosecutor confronted with further evidence of corruption should do—"follow the money"[28] and bring additional public corruption to light. Under these circumstances, the authority granted to him continued and the indictments issued by the grand jury were valid. Additionally, even if Pascoe exceeded his authority, Harrison did not suffer any prejudice. Accordingly, because I would uphold all three of Harrison's convictions, I concur in part and dissent in part.[29]

---

[28] While historians may debate whether this phrase was actually whispered to Bob Woodward by Deep Throat, it nevertheless has become "part of our national lexicon" after appearing in the 1976 docudrama, *All The President's Men*, "as a way to cut through the lies and deceptions and find the truth about the Watergate scandal." Kee Malesky, *Follow the Money: On the Trail of Watergate Lore*, NPR (June 16, 2012), https://www.npr.org/2012/06/16/154997482/follow-the-money-on-the-trail-of-watergate-lore.

[29] Because the majority reversed two of Harrison's three convictions based on Pascoe's lack of authority, it did not reach the remaining arguments before the Court: 1) statutory misconduct in office does not apply to members of the General Assembly; and 2) his convictions for common law misconduct in office and statutory

**BEATTY, C.J., concurs.**

misconduct in office violate the Double Jeopardy Clause of the United States Constitution. I believe both arguments are without merit, and I would affirm pursuant to Rule 220(b), SCACR.

1) As to statutory misconduct in office, section 8-1-80 defines public officers as "all officers of the State that have heretofore been commissioned and trustees of the various colleges of the State, members of various State boards *and other persons whose duties are defined by law*." (Emphasis added). Legislators' duties are defined by law in the South Carolina Constitution; therefore, legislators are public officers. *See* S.C. Const. art. III, § 1A ("The General Assembly ought frequently to assemble for the redress of grievances and for making new laws, as the common good may require."). Section 8-1-80, however, applies only to public officers whose authority is limited to a single election or judicial district; it is undisputed that each legislator's authority is limited to a single election. *See* S.C. Const. art. III, §§ 2, 6. Accordingly, Harrison's contention that members of the General Assembly are not public officers is without merit.

2) As to Double Jeopardy, see U.S. Const. amend V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."); S.C. Const. art. I, § 12 ("No person shall be subject for the same offense to be twice put in jeopardy of life or liberty . . . ."); *Stevenson v. State*, 335 S.C. 193, 198, 516 S.E.2d 434, 436 (1999). *See also Blockburger v. United States*, 284 U.S. 299, 304 (1932) (noting the test to determine whether there is a double jeopardy violation "is whether each provision requires proof of a fact which the other does not"). An application of the *Blockburger* test requires a "technical comparison of the elements" of the two offenses. *State v. Moyd*, 321 S.C. 256, 258, 468 S.E.2d 7, 9 (Ct. App. 1996). *Compare* S.C. Code Ann. § 8-1-80 (2019) (requiring the mental state of habitual negligence), *with State v. Hess*, 279 S.C. 14, 20, 301 S.E.2d 547, 550–51 (1983) (noting common law misconduct in office "includes any act, any omission, in breach of duty of public concern by persons in public office provided it is done *willfully and dishonestly*.") (emphasis added).

**JUSTICE JAMES:** I concur in part in and dissent in part from Justice Kittredge's majority opinion. I agree with each part of the majority opinion except that portion of Section III. C. in which the majority concludes Solicitor Pascoe had the authority to prosecute Appellant for perjury. For the reasons set forth by the majority in Section III. D. concerning Solicitor Pascoe's lack of authority to prosecute Appellant for misconduct in office, I would hold the prosecution of Appellant for perjury did not fall within the scope of Solicitor Pascoe's borrowed authority. I reject Appellant's argument that the Double Jeopardy Clause bars a retrial, and I would remand all three charges to the circuit court for prosecution by a duly authorized prosecutor.

In support of its conclusion Solicitor Pascoe had the authority to prosecute Appellant for perjury, the majority cites *United States v. Caron*, 551 F. Supp. 662 (E.D. Va. 1982), and *People v. Skibinski*, 389 N.Y.S.2d 693 (N.Y. App. Div. 1976). The *Caron* and *Skibinski* courts concluded the defendants in those cases could be prosecuted for perjury even though the defendants gave their allegedly false testimony before grand juries that were later found to be illegally constituted. As the majority explains, the *Caron* and *Skibinski* decisions are on solid ground in South Carolina because our perjury statute "is directed not so much at the effects of the perjurious statement, but rather at its perpetration and the 'probable wrong done the administration of justice by false testimony.'" *United States v. Williams*, 341 U.S. 58, 68 (1951). I agree with that basic proposition, but I do not agree it extends to provide Solicitor Pascoe with the authority to prosecute anyone other than the redacted legislators.

The dissent[30] contends Solicitor Pascoe was confronted with evidence of corruption on the part of Appellant and did what any other prosecutor should do— bring the corruption to light. While I have no quarrel with Solicitor Pascoe's motivation and sense of duty to bring public corruption to light, that is not the question before us. The question before us is whether he had the authority to prosecute the alleged offender. All he had to do to bring the corruption to light was report his suspicions to the Attorney General.

To be clear, I would reverse all three convictions and would remand this case to the circuit court for retrial, with the prosecution to be conducted by a duly authorized prosecutor.

---

[30] Following the majority's lead, I refer to Justice Hearn's writing as the dissent.

**CONCUR IN PART; DISSENT IN PART.**